IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 17, 2008

Charles R. Fulbruge III
Clerk

No. 06-20437

COLETTE WILEY; LLYLWYN MICHALS; ANGELA TAYLOR,

Plaintiffs–Appellants,

v.

AMERICAN ELECTRIC POWER SERVICE CORPORATION formerly
known as AEP Service Corporation formerly known as Central & South West
Corporation; AEP ENERGY SERVICES, INC.; CSW ENERGY, INC.,

Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Texas
4:04-CV-298

Before DeMOSS, DENNIS, and OWEN, Circuit Judges.

PER CURIAM:[*]

Colette Wiley, Llylwyn Michals, and Angela Taylor sued American Electric Power Service Corporation and related entities alleging retaliation, gender discrimination, and violation of the Equal Pay Act.[1] The district court granted summary judgment against the plaintiffs on all claims. We affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] 29 U.S.C. § 206(d).

I

American Electric Power Service Corporation (AEP) is a large electric utility provider, providing electricity to millions of customers in 11 states. In 1997, AEP entered the unregulated energy trading business through a subsidiary, AEP Energy Services, Inc. (Energy Services). AEP recruited Paul Addis as Executive Vice President of AEP, and he later became President of Energy Services.

At the time, other utility companies were also entering the unregulated energy trading field. AEP developed the AEP Energy Services 1997 Phantom Equity Plan (PEP) as a way to attract and hire key talent that was being recruited by competitors. The PEP was a profit-sharing program that would provide cash payments to participants if Energy Services experienced profits. Addis was authorized to allocate up to 15% of Energy Service's profits to PEP participants, subject to approval by the Compensation Committee. The Committee was originally composed of five men and one woman, and another woman was added later.

Addis and a Senior Management Team created a list of factors that would be considered for a candidate's participation in the PEP: how essential the person was to the energy trading group and the difficulty in attracting the individual; whether the person was a trader, marketer, or provider of critical support to traders or marketers; leadership qualities in trading, marketing, and administrative support; strategic ideas and long-term value for business and profitability; and the candidate's goals, objectives, competence, work ethic, successes, and competing opportunities. A candidate's job title was not given a high level of importance.

AEP announced in 1997 that it was to merge with Central and South West Corporation (CSW), but the merger was not finalized for another two-and-a-half years. Llylwyn Michals served as Vice President for CSW Energy (CSWE), a

CSW subsidiary. Michals hired Angela Taylor as Director of CSWE and Colette Wiley as Executive Director of CSWE. Addis and the Senior Management Team evaluated whether to retain members of CSW's leadership following the merger. Addis had dealt with Michals during the merger and questioned whether she and her team should be hired by AEP following the merger. Dwayne Hart, Vice President of Business Development for AEP, persuaded Addis to retain Michals to help manage the CSWE portfolio, and Michals, Taylor, and Wiley became employees of AEP. Several male executives and other employees from CSWE were not retained by AEP.

By the time Michals, Taylor, and Wiley joined AEP, the PEP had 56 participating members. After joining AEP, Michals requested to join the PEP, but AEP chose not to extend participation to any CSWE employees. Hart told Michals that he questioned CSWE's ability to handle existing energy accounts and that the PEP was closed because the 15% maximum had already been assigned.

Michals negotiated a new contract that allowed eligibility for participation in any new PEP that may be implemented in 2001, provided a raise, kept her previous bonus structure from CSWE, and kept her membership in a golf club. Taylor received a raise, eligibility in the 2001 Incentive Compensation Plan, continued participation in the CSWE bonus pool, and eligibility for inclusion in the 2001 PEP. Wiley received a raise as well.

Michals received a number of negative evaluations during her employment at AEP. Various supervisors questioned her performance and management. Co-workers and subordinates also provided negative reviews of Michals, leading to low ratings on an evaluation. Taylor and Wiley also did not receive positive evaluations. Despite these alleged performance deficiencies, the plaintiffs all received substantial bonuses as promised under their contracts.

In 2001, Michals complained to Hart when AEP used the PEP to recruit three males and one female during the acquisition of Houston Pipeline from Enron. Michals stated that individuals had resigned, creating openings in the PEP.

In 2001, following Enron's collapse, AEP decided to shift its focus from trading electricity to hard assets. AEP decided not to implement a 2001 PEP. In 2002, AEP announced a Sustained Earnings Improvement (SEI) initiative that would eliminate certain jobs. Five traders were fired for reporting inaccurate information for trade publications, and AEP's stock price plummeted following news of the traders' misinformation. Holly Koeppel also replaced Eric van der Walde as Executive Vice President of Wholesale at AEP in late October 2002.

Also in 2002, Michals and Taylor attended a mandatory discrimination and harassment seminar and complained to Human Resources Region Manager Jeff Keifer that they had been excluded from the PEP because of their gender. Keifer then reported the complaint to Robert Cohn, Vice President of Human Resources. Michals, Wiley, and Taylor responded to an inquiry by Cohn that they had documents supporting their allegations but never released these doucments allegedly because they feared reprisal. Cohn investigated the complaint and told Michals that AEP retained a majority of the women from CSW, that both men and women participated in the PEP, and that Michals received bonuses higher than many males.

Koeppel began her tenure as Vice President of Wholesale by looking for broad-scale ways to cut costs and eliminate jobs. Within a few days of assuming that position and receiving organizational charts, Koeppel decided to eliminate a large number of positions outside of Ohio. During a meeting at lunch in early November, Cohn discussed the plaintiffs' harassment complaints with Koeppel, but Koeppel immediately informed Cohn that she had already decided to

terminate the group in which the plaintiffs worked, so their participation in any future PEP was moot. Michals, Taylor, and Wiley were terminated by AEP along with 1,300 other employees nationally.

Following their termination, the plaintiffs filed discrimination charges with the EEOC. After a 15-month investigation, the EEOC found reasonable cause existed to believe that AEP denied the plaintiffs participation in the PEP and that AEP fired the plaintiffs in retaliation for their complaints.

Michals, Wiley, and Taylor sued AEP in federal district court, alleging disparate pay, gender discrimination, and retaliation in violation of Title VII[2] and the Equal Pay Act.[3] AEP moved for summary judgment on the merits of the plaintiffs' claims. The district court granted summary judgment to AEP, finding no causal connection between the plaintiffs' complaints and their termination and no evidence of gender discrimination regarding the pay disparities. The plaintiffs now appeal the summary judgment.

## II

As an initial matter, the plaintiffs have sought to introduce evidence not considered by the district court under the guise of Federal Rule of Appellate Procedure 28(j). Rule 28(j) only allows for the introduction of "pertinent and significant authorities" that have come to a party's attention after the filing of a brief or oral argument. The plaintiffs do not seek to introduce new legal authority but instead wish to supplement the record with evidence that was not part of the summary judgment record in the district court, and we therefore will not consider this evidence.

---

[2] 42 U.S.C. § 2000e.

[3] 29 U.S.C. § 206(d).

III

The plaintiffs argue that the district court improperly granted summary judgment on their retaliation claim. We review the district court's grant of summary judgment de novo, viewing the evidence and making all reasonable inferences in favor of the non-movant.[4]

To show a prima facie case of retaliation, the plaintiffs must prove: "(1) that [they] engaged in activity protected by Title VII . . . ; (2) that an adverse employment action occurred; and (3) that there was a causal connection between the participation in the protected activity and the adverse employment decision."[5] The plaintiffs allege that they were terminated as a result of their harassment complaints. The district court found that no causal connection existed between their complaints and the terminations because Koeppel, the executive who ultimately decided to terminate the plaintiffs, did not have knowledge of the complaints until after she had decided to terminate the plaintiffs.

The plaintiffs first argue that Koeppel is an interested witness whose testimony is not credible because of her inherent bias. In support, the plaintiffs cite Reeves v. Sanderson Plumbing Products, Inc. for the proposition that testimony from a interested witness is not appropriate for consideration of summary judgment.[6] However, the plaintiffs fail to provide any reason why Koeppel is an interested witness other than her status as a decision-maker at AEP. We have previously stated that this is not sufficient to be considered an interested witness:

---

[4] McNeil v. Wyeth, 462 F.3d 364, 367 (5th Cir. 2006).

[5] Shirley v. Chrysler First, Inc., 970 F.2d 39, 42 (5th Cir. 1992).

[6] Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).

> The definition of an interested witness cannot be so broad as to require us to disregard testimony from a company's agents regarding the company's reasons for discharging an employee. . . . [T]o so hold would foreclose the possibility of summary judgment for employers, who almost invariably must rely on testimony of their agents to explain why the disputed action was taken.[7]

Without further evidence, Koeppel is not an interested witness under our precedent.

The plaintiffs further contend that Koeppel knew about their the complaints by virtue of her membership in the Plan Compensation Committee. They claim that Koeppel would have been "keenly interested" in complaints about the PEP plan. Regardless of whether Koeppel would have been interested in the complaints, the plaintiffs provide no evidence or argument that Koeppel actually knew about the plan, and this contention is therefore meritless.

The plaintiffs also argue that Koeppel's testimony that she did not learn about the harassment complaints until after she decided to terminate the plaintiffs is contradicted and inconsistent with other testimony in the record. Koeppel testified that she first learned about the complaints at a lunch with Cohn around the first of November, about a week after she became Vice President of Wholesale. After Cohn told her of the complaints, she informed Cohn that she had already decided to terminate the plaintiffs. Cohn corroborates Koeppel's testimony, and he also describes the meeting as being around the first of November.

The plaintiffs claim that Koeppel's timeline is impossible because she also testified that she began her new position in late October, received organizational charts around October 29, and made the decision to terminate the plaintiffs in

---

[7] Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 898 (5th Cir. 2002) (citing Traylor v. Brown, 295 F.3d 783 (7th Cir. 2002)).

early November. The plaintiffs mistakenly assign November first as the concrete date for the lunch meeting between Cohn and Koeppel. In fact, both Koeppel and Cohn testified that meeting was around November first—neither definitively claims that the meeting happened on that exact date. When pressed, Koeppel testified that the meeting was likely between November first and seventh.

The timeline presented by Koeppel and Cohn is not disputed by any other evidence in the record. The plaintiffs have not shown a genuine issue of material fact that Koeppel knew about the plaintiffs' complaints before she decided to terminate them, as both Koeppel and Cohn have testified. Without knowledge of the complaints, there cannot be a causal connection between the plaintiffs' complaints and subsequent termination, and we therefore affirm the district court's grant of summary judgment for AEP on the retaliation claim.[8]

The plaintiffs also contend that the district court erred in describing their burden of proof under the McDonnell Douglas framework and ignored significant evidence of pretext. The district court stated that if the plaintiffs established a prima facie case and AEP provided a legitimate non-discriminatory reason for the termination, "summary judgment is appropriate unless the employee can prove that the employer's rationale is pre-textual." The plaintiffs contend that they need not prove pretext but merely "produce evidence raising a fact issue as to whether" the reason was pretextual.[9] We need not address these arguments

---

[8] See Manning v. Chevron Chem. Co., LLC, 332 F.3d 874, 883 n.6 (5th Cir. 2003) ("Although the plaintiff's burden at the prima facie stage is not onerous, the plaintiff must produce at least some evidence that the decisionmakers had knowledge of his protected activity. If the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity.") (citation omitted).

[9] Medina v. Ramsey Steel Co., Inc., 238 F.3d 674, 682 (5th Cir. 2001).

because the pretext analysis only applies if the plaintiffs successfully establish a prima facie case,[10] and here, they have failed to establish a prima facie case.

## IV

The plaintiffs also argue that district court erred in granting summary judgment on their Equal Pay Act and Title VII claims for disparate pay. To establish a prima facie case for disparate pay under the EPA, the plaintiffs must show: "1. [AEP] is subject to the Act; 2. [the plaintiffs] performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and 3. [they were] paid less than the employee of the opposite sex providing the basis of comparison."[11] To establish a prima facie case under Title VII, the plaintiffs must show: (1) they were members of a protected group; (2) they applied for a position; (3) they were qualified for that position when they applied; (4) they were not selected for that position; and (5) after the employer declined to hire them, the position either remained open or a male was selected.[12] The plaintiffs claim that AEP discriminated against them by not including them in the PEP because of their gender.

Assuming arguendo that the plaintiffs established a prima facie case under the EPA and Title VII, AEP can raise an affirmative defense to both Title VII and the EPA that the pay disparity "is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."[13] AEP asserts affirmative defense (iv) by arguing that any "differential in pay was based on a factor other than sex." It presents evidence

---

[10] See Strong v. Univ. Healthcare Sys., L.L.C., 482 F.3d 802, 805-06 (5th Cir. 2007).

[11] Chance v. Rice Univ., 984 F.2d 151, 153 (5th Cir. 1993).

[12] Davis v. Chevron U.S.A., Inc., 14 F.3d 1082, 1087 (5th Cir. 1994).

[13] Plemer v. Parsons-Gilbane, 713 F.2d 1127, 1136 (5th Cir. 1983) (quoting 29 U.S.C. § 206(d)(1)).

that it decided whom to admit to the PEP based on: how essential the person was to the energy trading group and the difficulty in attracting the individual; position as a trader, marketer, or one who provided critical support to traders or marketers; leadership qualities in trading, marketing, and administrative support; strategic ideas and long-term value for business and profitability; and the candidate's goals, objectives, competence, work ethic, successes, and competing opportunities. If uncontradicted in the record, these factors are sufficient to satisfy AEP's burden.

The plaintiffs contend that the record contradicts AEP's explanation. They point to Dwayne Hart's testimony that there was "no rhyme or reason" to selections. But Hart's testimony makes clear that Hart is describing the availability of PEP shares rather than the criteria used to evaluate potential PEP participants. Because the PEP was capped at 15% of AEP's profits, AEP determined PEP participation availability by how subscribed the PEP was at the time of the recruit's hire. Hart explained that employees hired in 1997 were fortunate, because the PEP was just being implemented and many shares were open. But employees hired in 2000 were less fortunate, because fewer (or no) shares were available that year. Thus, Hart was not testifying about the criteria for PEP participation but about the availability of PEP shares.

The plaintiffs also claim that George Rooney testified AEP had no criteria for PEP inclusion. Rooney only testified, however, that he was not aware of the criteria for PEP participation. He was asked: "Do you know whether there are any criteria for getting on the Phantom Equity Plan?" Rooney responded, "No." A moment later he testified: "As I said, I was not really involved with the specifics of the equity plan. And as a result, if there was some criteria that existed, I didn't know about it." Rooney never affirmatively claimed that no criteria existed, and he unequivocally stated that he was not responsible for making decisions about the plan.

The plaintiffs also unreasonably construe testimony of Rodney Plimpton, former Senior Vice President of Human Resources. According to the plaintiffs, Plimpton testified that plan participation was not based on merit or individuals achieving any objective criteria or goal. The record does not support this contention. When Plimpton stated that the PEP is not a merit or objective-based compensation system, he was describing the actual pay out of money and not the inclusion in the PEP. Once someone was granted participation in the PEP, he or she did not have to continue to meet any goals or show any specific merits to receive the pay out—the employee automatically received the designated share. The plaintiffs also claim Plimpton testified that inclusion in the plan was not based on seniority; this contention is accurate but irrelevant, as AEP does not rely on the "seniority system" affirmative defense. The plaintiffs also claim Plimpton acknowledged that any PEP participation criteria were unwritten. While this claim accurately describes Plimpton's testimony, it also is irrelevant, as the plaintiffs do not cite—and we have not found—any cases requiring a defendant's non-sex criteria to be in writing.

The plaintiffs also cite Paul Addis's testimony that the PEP participation decisions ultimately became a "judgment call." The plaintiffs argue that by using this phrase, Addis testified that participation decisions were subjective. But in context, it is clear that Addis used the term simply to mean that he had to make a decision based on several factors. When a large number of factors are considered, it is inherent that a decision (or "judgment call") must eventually be made about whether an individual is offered PEP participation. That does not mean the decision is subjective.

AEP presents uncontroverted evidence that it based plan participation on factors other than sex. Assuming arguendo that the plaintiffs established prima facie cases under the EPA and Title VII, AEP has met its burden of proving the

affirmative defense. We therefore affirm the district court's grant of summary judgment on the plaintiffs' EPA and Title VII claims.

* * *

For these reasons, we AFFIRM the district court's judgment.