**Jan HARRIS, et al, individually and on behalf of others similarly situated, Plaintiffs,**

v.

**AUXILIUM PHARMACEUTICALS, INC., Defendant.**

Civil Action No. 4:07–cv–3938.

United States District Court, S.D. Texas, Houston Division.

Sept. 28, 2009.

---

Scott David Newar, Attorney at Law, Houston, TX, for Plaintiffs.

A. Martin Wickliff, Jr., Charles Howard Wilson, Epstein Becker et al., Houston, TX, David S. Fryman, Farrah I. Gold, John Langel, Ballard Spahr Andrews & Ingersoll, LLP, Kelly T. Kindig, Philadelphia, PA, for Defendant.

## *MEMORANDUM AND ORDER*

KEITH P. ELLISON, District Judge.

Before the Court are Plaintiffs' Motion to Certify Class (Doc. No. 54), Defendant's Motion to Extend Time to Respond to Plaintiff's Motion to Certify Class (Doc. No. 55), Defendant's Motion for Summary Judgment (Doc. No. 76), Motion to Strike Plaintiffs' Summary Judgment Evidence and for Sanctions (Doc. No. 85), and Defendant's Motion to Exceed Reply Page Limit (Doc. No. 87). After considering the parties' filings and the applicable law, the Court finds that Defendant's Motion to Strike and for Sanctions should be granted in part and denied in part, Defendant's Motion to Exceed Reply Page Limit should be granted, Defendant's Motion for Summary Judgment should be granted in part and denied in part, Plaintiffs' Motion for Conditional Class Certification should be denied as moot, and Defendant's Motion to Extend Time to Respond to Plaintiffs' Motion to Certify Class should be denied as moot.

## I. BACKGROUND

This dispute arises out of Plaintiff Jan Harris's employment with Defendant Auxilium Pharmaceuticals, Inc. ("Auxilium").[1] Defendant is a specialty biopharmaceutical company that targets patient populations with unmet medical needs and focuses on

---

1. For the purpose of this Motion only, the facts will be presented in the light most favor- able to Plaintiffs.

developing and marketing to urologists, endocrinologists, orthopedists and select primary care physicians. (Susan Roberts Aff. ¶ 2, Doc. No. 77, Ex. A.) Defendant markets Testim 1% ("Testim"), a topical testosterone gel for the treatment of hypogonadism, and has several projects in clinical development. (*Id.* at ¶ 3.)

### A. Medical Sales Consultants

Jan Harris began working for Defendant on or about January 29, 2003 as a Medical Sales Consultant ("MSC"). (Doc. No. 77, Ex. B1.) Kathy Parks began working for Defendant as an MSC on a parttime basis in December 2002.[2] Parks became a full-time MSC on February 1, 2003. (Parks Dep. 31, Feb. 2, 2009.)

MSCs are responsible for developing relationships with pharmacies and doctors in different therapeutic areas. (*Id.* at 43:1–19.) MSCs develop a rapport with physicians and office staff in order to gain and improve their access to the office. (*Id.* at 44:23–45:3.) MSCs must have good product knowledge of Testim in order to promote its features and benefits. (*Id.* at 45:25–46:3.) MSCs use sales data, provided by Defendant, and in some cases show it to physicians to increase sales. (*Id.* at 51.) They are required to bring promotional materials with them to the doctor's office, but they use these materials at their discretion. (Hatten Dep. 59:1–60:8, Jan. 13, 2009.) If a doctor has a medical question that is not addressed by Defendant's promotional materials, the MSC must direct the question to Defendant's Medical Affairs Department. (*Id.* at 64:22–25.) They bring "detail pieces" which are distributed by Defendant's marketing department, and Defendant recommends that the MSCs discuss the detail piece within the first ten seconds of their meeting with the

physician. (*Id.* at 60:1–25.) MSCs are graded in their evaluations as to whether they satisfy this objective. (*Id.* at 62:6–16.) They are expected to discuss with the physician any problems he might have with Testim. (*Id.* at 50:11–17.)

MSCs "brand" the doctor's office by leaving pens and educational material after their calls. (*Id.* at 60:1–13.) It is a violation of Defendant's policies for MSCs to use unapproved materials to promote Testim. (Kessig Dep. 167–168, Jan. 20, 2009.) MSCs are also responsible for planning speaker programs once a month, picking a physician from an approved list and inviting certain physicians from their territories to attend. (Parks Dep. 72–74.)

MSCs are expected to "close the sale" by detailing the product, getting an agreement from the doctor to use the product, and then conclude with a "call for action" and follow-up. The doctor's commitment to use the product is not put into writing, and the doctor may chose not to take the agreed upon action once the MSC leaves the office. (Kessig Dep. 167–168.) MSCs cannot enter into binding contracts with the physicians or negotiate the purchase price for Testim. No money is exchanged when MSCs "close the sale." (Hatten Dep. 67:24–69:21.)

Defendant gives MSCs a list of physicians to contact, including the physician's specialty and demographic information. (Parks Dep. 34:1–9.) MSCs are restricted from seeing doctors other than those whose names Defendant provides. (*Id.* at 27:1–4.) MSCs also call on pharmacies to persuade them to stock Testim. (*Id.* at 26:12–13.) Defendant determines an MSCs territory, which encompasses the doctors and pharmacies she is required to visit.[3] MSCs are required to live in the

---

2. As will be discussed *infra,* the parties dispute to what extent Kathy Parks is a party to this lawsuit.

3. Harris's territory was titled "North Houston." (Harris Dep. 56:16–17.)

territory they are hired to serve. (Harris Dep. 55:19–56:5, Feb. 10, 2009.) The geographic size of the territories varies, but each has roughly the same number of doctors. (*Id.*) MSCs cannot call on doctors outside of their assigned territory. (Hatten Dep. 47:1–3.)

MSCs do not have an office—instead, Defendant provides them with a car or vehicle reimbursement, a laptop computer, and a Dell Axiom, a handheld computer. It is up to the MSC to decide where to conduct business. (Harris Dep. 22:14–17.) MSCs record on their handheld computers which physicians they visit and when. (*Id.* at 65:22–25.) Every quarter MSCs must provide their RSDs with "routing schedules" that break down their daily cycle of which doctors they will call on each day. These are "breathing documents" and MSCs do not have to follow them exactly (Hatten Dep. 54:18–23.) Defendant gives MSCs guidelines about the number of physicians they should visit and the percentage of doctors MSCs should visit in a particular amount of time. (Hatten Dep. 56:1–10.) MSCs are evaluated on their ability to satisfy these guidelines. (*Id.* at 57:5–9.) Defendant recommends that MSCs call on doctors prescribing the most Testim, and that they call on them at least once per week. (Hatten Dep. 52:11–52:25.) If an MSC fails to call on these doctors frequently, such failure could result in a lower field coaching report from her supervisor. (*Id.* at 53:16.) Furthermore, Defendant recommends that MSCs call on at least two pharmacies per week. (*Id.* at 54:6–10.) MSCs are paid incentive compensation and would receive contest awards based on the number of prescriptions that are written in their territory. (Parks Dep. 54:12–17.)

When she visited doctors, Harris would occasionally be accompanied by her Regional Sales Director ("RSD"), Jeffrey Hatten, or Mark Mosebrook, who worked in Defendant's corporate headquarters. (Harris Dep. 59–60; 21:6–12.) Most of the time Harris was working, however, she would visit doctors alone. (*Id.* at 59:14–15.) Sometimes Hatten would go months without accompanying Harris on her visits. (*Id.* at 62:12–15.) Harris did not keep track of how many hours per week she worked. (*Id.* at 62:21–25.) MSCs were advised, however, that it was "not a forty hour workweek" and that they should be in the field between 8:00 a.m. and 9:00 a.m., and that they should make their last call between 4:00 p.m. and 5:00 p.m. After driving home, Harris would sync her handheld computer, review emails, and occasionally do dinner programs or travel. (*Id.* at 63:1–15.) Harris estimates that she worked anywhere from sixty to seventy-five hours per week. (*Id.* at 67:1–8.) Her hours and work schedule varied from week to week. (*Id.* at 68:17–18.) Parks estimates that she worked anywhere from 60–70 hours per week, and she never reported to Defendant how many hours she worked in a particular week. (Parks Dep. 77:19–78:14.)

Harris understood her primary function to be to take the information she had received in training and deliver it to physicians. (Harris Dep. 21:21–24.) From time to time, MSCs are required to prepare a document entitled a "Monthly Business Summary." (*Id.* at 38:6–11.) The document has a section labeled "Significant Issues" in which the MSC, in consultation with her supervisor, discusses issues she is having in the field. (*Id.* at 38:18–39:10.) Harris's Monthly Business Summaries indicate that, in one instance, after bringing a particular physician coffee and learning from his staff that he liked it, Harris continued to bring him coffee. (*Id.* at 57:4–25.) Harris commented that another physician "will be a good thought leader if he can make time to speak." (*Id.* at 58:9–16.) The document indicates that, on occasion,

Harris would meet with particular physicians to discuss why they had stopped writing prescriptions for Testim. (*Id.* at 40:8–10.) Harris acknowledges that intelligence played some role in her success as an MSC, because "doctors can recognize if they are dealing with a person with some intelligence of some sort." (*Id.* at 178:14–17.) Harris claims that, in 2006, in the North Houston territory, she helped Defendant achieve a 31 percent market share. She acknowledges that this was due in part to her efforts and in part to the clinical trials and "detail pieces" she received from Defendant. (*Id.* at 183:14–18.) However, at one point in her deposition, Harris testified that her role was limited to "handing out pens and the table paper" that Defendant provided. (*Id.* at 184:22–25.)

Parks, in describing her calls, testified that she would usually walk into the doctor's office because she "had a very good rapport with doctors, and they knew me." She would tell them about the benefits of the drug, but she stated that she usually did not have to because they knew her so well. She would inquire if they needed vouchers or samples. (*Id.* at 27:8–17.) Because Testim is a controlled substance, MSCs cannot carry samples of it, but they do have sample request forms that physicians sign. (*Id.* at 28:8–251 Hatten Dep. 57:14–58:8.) Once an MSC gets a commitment from a doctor to use the Testim, she has the doctor sign the form. (Kessig Dep. 165:12–15.) MSCs later fax the sample forms to be processed by Defendant's corporate headquarters. (Parks Dep. 28:8–25.) Parks testified that Defendant did not like to distribute samples, because it would rather have the doctor write a prescription, but that she continued to give out the sample forms because "doctors like samples." (*Id.* at 30–31.) Parks further testified that sometimes she did not fax in the sample request form, but instead just got the doctor to sign the form so that she would have an opportunity to talk to him. (*Id.*) Parks would also buy candy for the doctors because it would help her gain entry into the office. (*Id.* at 36:12–20.) According to Parks, while the handheld computer did track when the MSCs visited physicians, it did not track other activities, such as time spent at dinner meetings or buying candy for physicians. (*Id.* at 38.) For instance, the handheld computer recorded when Parks began work every day, but it did not indicate when she finished work because she could still do work, such as faxing and email, after she synced her handheld device. (Parks Dep. 42:19–24.) The company provided MSCs with sales aid, but Parks did not always use the aids because "it was a difficult thing to pull out every time you went there when you knew the doctor so well." (*Id.* at 47:1–10.)

When asked in which cases she would show a doctor sales data, Parks responded that she would possibly show it if a doctor asked for it, but that "[y]ou can't walk into a doctor's office and show them every piece of documents that you have in your bag. There's not that much time. I don't know about you, but if you're seeing a doctor as a patient, you don't want a rep to sit there and take up all the time." (*Id.* at 52:1–7.) Parks testified that MSCs are required to call on a specific number of doctors every day, but that it "depended on a lot of different things." (*Id.* at 57:1–5.) Parks' Monthly Business Summary for January 2006 indicates that she "changed [her] strategy and informed the nurses and MA about the voucher card and its benefits for their patients. Samples still seem to be a greater asset in this territory." (*Id.* at 65:5–9.) Parks would also arrange events with physicians, like a breakfast at the Village Family Practice. (*Id.* at 67:16–25.)

## B. Jan Harris's Employment with Auxilium

Harris worked as an MSC from January 29, 2003 to October 2, 2007. (Doc No. 84, Ex. F ¶ 5.) In 2004, Defendant employed 132 MSCs. Of those, approximately 31 were over the age of forty. (*Id.*) In 2005, Defendant employed 125 MSCs. Of those, 33 (or approximately 27 percent) were over the age of forty. Of the 33 MSCs over the age of forty, 14 were female. In 2006, Defendant employed 187 MSCs. Of those, 49 (or approximately 27 percent) were over the age of 40. Of the 49 MSCs over the age of 40, 25 were female. Finally, in 2007, Defendant employed 182 MSCs. Of those, 69 (or approximately thirty eight percent) were over the age of 40. Of the MSCs over the age of 40, 37 were female. (*Id.*) [4]

Harris received many accolades during her career as an MSC. In 2003, Defendant ranked Harris # 11 out of 75 MSCs, and in 2004, Defendant ranked Harris # 6 out of 131 MSCs and awarded her the company's prestigious "President's Club" award. (*Id.* at ¶¶ 6–7.) In 2005, Defendant ranked Harris # 14 out of 125 MSCs. (*Id.* at ¶ 8.)

In early 2005, Jeffrey Hatten was hired as RSD for the Lone Star Region and became Harris's supervisor. (Harris Dep. 49:6–7.) Eleven MSCs reported directly to Hatten. (Hatten Dep. 43:1.) According to Harris, Hatten "preferred to work with

men." For instance, some male MSCs with lower sales quotas than Harris would accompany Hatten to a hunting store because Hatten liked to hunt. (Harris Dep. 48:1–49:5.) During her first "ride-along" with Hatten, he asked Harris what type of doctors were in her region.[5] She explained that she had a large HIV physician base because people who suffered from HIV were often hypogonadal. (*Id.* at 49–50.) Hatten asked Harris if these doctors were typically homosexual, and Harris responded that they were. (*Id.* at 50:7–12.) At that point in the ride-along, Harris had arrived at a hospital they were going to visit, and Hatten began to quote Bible verses to Harris and tell her that "homosexuals and gays will go to hell." (*Id.* at 50–13.) Harris then explained to Hatten that her brother, who was gay, had been killed by AIDS. (*Id.* at 50–51.) Hatten informed Harris that he wanted to tell her about Billy Graham and his personal religious beliefs. Hatten explained that Billy Graham taught that in order to have a strong marriage, it was important for a man not to be alone with members of the opposite sex, ever, except for his wife. Hatten told Harris that "this presented a problem to him." (*Id.* at 52:1–8.) [6]

Harris also testified that, in the early part of 2007, another MSC told her that other MSCs were calling her a "High Dollar Whore" and "Debbie Downer." (*Id.* at

---

**4.** As Defendant points out in its Reply, Plaintiffs have not advanced failure to hire claims.

**5.** A "ride along" is when a manager accompanies an MSC on her sales calls for one or two days. (Hatten Dep. 66:17–20.)

**6.** April Coltharp, a former MSC who was older than Hatten, submitted an affidavit asserting that Hatten made similar comments to her. Coltharp, like Harris, had the opportunity to talk extensively to Hatten during the ride alongs. In one of their first ride alongs, Hatten told Coltharp that it was against his religion to be alone with a woman other than

his wife. Hatten told Coltharp that he did not want his wife to work and made it a point to introduce Coltharp to his wife because she "wanted to meet the girls her husband works with." (Doc. No. 84, Ex. R ¶¶ 1–7.) When Coltharp resigned from Defendant, she reported Hatten's derogatory comments to Sue Sharr in Defendant's Human Resources Department. (*Id.* at ¶ 11.) Parks testified to similar comments Hatten made. In particular, during one ride along, Hatten told Parks that, in his opinion, primarily black and Hispanic women should have abortions. (Doc. No. 84, Ex. U ¶ 12.)

99.) Shortly afterwards, Harris confronted Hatten with this information. He responded that it had happened, and he was sorry. (*Id.* at 102:1–4.) According to Harris, Hatten took it "very seriously" and told her to "let [him] see if [he] could put a stop to it." (*Id.* at 6–9.) Harris asked if it had been going on for a long time, and he told her it had. When she asked why he had not put a stop to it, because he was the manager, he responded that he would try to take care of it. (*Id.* at 102:6–14.) The next day, Harris inquired of Hatten what he had done. He told her that he had called four individuals and that he thought he had taken care of it. (*Id.* at 102–103.) Harris argues that Hatten should have been disciplined for failing to report this incident to the Chief Compliance Officer at Auxilium. (*Id.* at 104:2–106:1.) No MSC was ever disciplined for calling Harris "Debbie Downer" or "High Dollar Whore." (Roberts Dep. 53:18–25, Jan. 21, 2009.) Harris believes that, at some point, she asked, to be assigned to an RSD other than Hatten, but she cannot be sure. (Harris Dep. 106–109.)

Harris also felt that others were being promoted when she had more experience and a better performance record. (*Id.* at 109:19–22.) Harris felt that, based on the high rankings she received and the fact that she "did the job well" she should have been considered for a promotion. (*Id.* at 186:4–14.) Harris received favorable feedback from supervisors, including Hatten. (*Id.* at 186–187.) In order to receive a promotion, an MSC must be recommended by her RSD. (*Id.* at 110:1.) At one point, Harris had a conversation with Hatten and told him that she felt she was qualified for a promotion and that she was interested in one. (*Id.* at 110–111.) Harris alleges that she expressed an interest in a promotion only to Hatten because "[she] could not go outside the chain of command." (*Id.* at 21–25.)

Harris complains that two male employees received promotions shortly after this conversation. (*Id.* at 111:15–25.) She further contends that Sarah Degen, a younger woman, was promoted to Marketing Development Manager when she had never received any kind of award or been part of the President's Club. Harris alleges that the position was never even posted so that others could apply. (*Id.* at 115:22–116:2.) Harris further avers that Degen was promoted because she was engaged in a romantic relationship with Ed Kessig, Defendant's Vice President of Sales. (*Id.* at 116–119.) According to Harris, Defendant hires younger MSCs because Testim is a "quality of life drug," one of the benefits of which is to make the patient feel younger and to have more vigor. (*Id.* at 176:7–14.)

For a short period of time, at the beginning of 2005, Harris served as Regional Sales Trainer ("RST"), but she did not receive extra pay for the position. (*Id.* at 68:21–7.) RSTs are responsible for training the new MSCs hired into a region. (*Id.* at 72:3–15.) Ed Kessig called Harris and asked her to attend a training session in Philadelphia for the position. (*Id.* at 69:1–16.) At the training, Harris was told that Defendant was considering giving the RSTs a bonus of $2000 when they completed the training. (*Id.* at 70:16–25.) Harris alleges that, when she returned from training and explained the function of the job to Hatten, he told her that he had a "different idea of what the trainer position would be." (*Id.* at 74:1–6.)

A May 2005 email exchange reveals that Harris informed Hatten that she had a large geographic territory and did not want to take time out of the field because she considered "selling Testim successfully [her] first priority and focus." (*Id.* at 213:17–21.) In the same email, Harris told Hatten that she did not believe that a quiz Hatten wanted her to administer fell into

the RST's responsibilities and that she would like to "stay focused on the field and selling." (*Id.* at 214.) She then informed Hatten that, if he thought the quiz was the RST's responsibility, then "maybe she was not the person for the job." (*Id.*) Hatten then replied to Harris by describing the RST position as he envisioned it and asking her if it was something she wanted to go forward with. (*Id.* at 220:17–20.) Harris responded that the job he was describing was different from that which she had been trained for in Philadelphia. She informed him that she could not afford to be the RST for their region. (*Id.* at 222–223.) Harris informed Hatten that she "had to make large bonuses for [her] job to work." (*Id.* at 224:13–14.) Hatten then made Greg Sanchez, who had recently transitioned from being a part-time to a full-time MSC, the RST. (*Id.* at 74:1–5.)

In early 2007, Defendant implemented an incentive compensation plan for MSCs based on whether the MSC could achieve a certain quota of Testim prescriptions within her territory. (Doc. No. 84, Ex. F ¶ 9.) In 2006, Testim had a national market share of 19 percent; however, when it implemented the quota system, Defendant assigned Harris an annual quota of 5,676 prescriptions for the North Houston territory, which accounted for 67 percent of the market share. (*Id.* at ¶ 10.) As a result, Harris asserts that her 2007 quota was unattainable. Hers was the highest quota in her region and the fourth highest in the country. (*Id.* at 82:13–20.) Harris contends that she was deprived of substantial incentive compensation that Defendant pays MSCs who achieve their quotas. (*Id.* at ¶ 12.) According to Plaintiffs, an MSC can get paid a bonus only if he or she obtains one hundred percent of his or her quota. (Harris Dep. 161:1–19.) If Harris did not obtain her quota, she would make less money and lose her rank at the top of the company. If she ranked near the bottom of the company, she would risk termi-

nation for being a "low performer." (*Id.* at 82:13–20.) Harris concludes that, if her quota would have been fair, she would have qualified for the President's Club bonus again in 2007. (*Id.* at 267:24–25.) Harris believed that Hatten was hiring younger women for MSC positions and giving them lower quotas. Harris complained to Hatten about the quotas, and he tried to offer her some explanation. (*Id.* at 96.)

Harris took a leave of absence on June 12, 2007 and resigned from Defendant on October 12, 2007. (Harris Dep. 121; 289–90.) Harris alleges that her replacement, Gerald Brady, a younger man, receives a higher base salary than she did and has a lower sales quota. (*Id.* at 171:15–25; Kessig Dep. 198–199.) Parks took a leave of absence from her position on June 2, 2007 and returned to work on September 10, 2007. (Parks Dep. 240.) Parks took another leave of absence from October 8, 2007 to November 12, 2007 and was ultimately terminated on January 10, 2008 because she refused to perform her job duties. (*Id.* at 96, 99, 140–141, 240.)

In her Second Amended Complaint, Harris asserts, on behalf of herself, Parks, and others similarly situated, that Defendant violated the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), *et seq.* and § 215, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Harris also asserts claims arising from Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*

## II. ANALYSIS

### A. Whether Parks is a Party and Plaintiffs' Rule 11 Motion

Defendant argues that Parks has joined this matter only as an opt-in plaintiff to Harris's FLSA and EPA claims. Accord-

ing to Defendant, Parks has not joined this suit with respect to the Title VII or ADEA claims. Citing Federal Rule of Civil Procedure 10(a), Defendant points out that Parks is not listed as a plaintiff on Harris's Second Amended Complaint. Parks originally filed her own complaint alleging these claims, but on December 14, 2007, the Honorable Lynn Hughes dismissed Parks' complaint because she had failed to exhaust her administrative remedies. Parks received a right to sue letter from the EEOC on April 29, 2008, but, according to Defendant, she has never refiled her Title VII or ADEA claims in this or any other Court. (Doc. No. 84, Ex. Z.) Plaintiffs respond that, after Parks exhausted her administrative remedies, she joined the Second Amended Complaint, which was filed on June 30, 2008. (Doc. No. 33.) Plaintiffs also request that the Court sanction Defendant, pursuant to Federal Rule of Civil Procedure 11, for making false representations to the Court.

■ Federal Rule of Civil Procedure 10(a) states: "Every pleading must have a caption with the court's name, a title, a file number, and a Rule 7(a) designation. The title of the complaint must name all the parties; the title of other pleadings, after naming the first party on each side, may refer generally to other parties." This requirement extends to amended complaints, as the necessary consequence of the rule that an amended pleading completely supersedes the prior pleading such that the prior pleading no longer has legal effect. *Jones v. Parmley*, No. 5:98–cv–374, 2005 WL 928666, at *1 (N.D.N.Y. April 20, 2005) (citing *Thompson v. Kramer*, Civ. A. No. 93–2290, 1994 WL 702927, at *11 (E.D.Pa. Dec. 13, 1994) and *Hamilton v. Covington*, 445 F.Supp. 195, 199 (W.D.Ark.1978)); *see also Washington v. M. Hanna Const. Inc.*, 299 Fed.Appx. 399, 402 (5th Cir.2008) (not designated for publication) (citing *King v. Dogan*, 31 F.3d 344, 346 (5th Cir.1994) (holding that the

allegations in the plaintiff's amended complaint supersede the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading)). "Therefore, a party that is not named in the caption of an amended complaint is not a party to the action." *Jones*, 2005 WL 928666 at *1.

■ Harris filed her First Amended Compliant on March 7, 2008. Attached to the First Amended Complaint was Park's consent to join the suit with respect to all the claims. (Doc. No. 13, Ex. 1.) As Defendant points out, however, Parks had not at that point exhausted her administrative remedies with respect to the Title VII and ADEA claims. A court may entertain a Title VII or ADEA claim only if the aggrieved party has exhausted his or her administrative remedies. *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir.2002); *Fobbs v. Potter*, 338 Fed.Appx. 359, 360–61 (5th Cir.2009) (not designated for publication) (citing *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir.2006)). The First Amended Complaint acknowledged this, stating that "Ms. Parks consents to participate as a plaintiff with respect to the EPA and FLSA claims. Upon requesting and obtaining a Right to Sue letter from the EEOC, Ms. Parks will have exhausted her administrative remedies with respect to her claim against Auxilium under Title VII and the ADEA." (Doc. No. 13 ¶ 37.)

Plaintiff's Second Amended Complaint was accompanied by a Motion for Leave to Amend, filed on June 30, 2008. The Motion began by stating that "Plaintiff, Jan Harris, individually and on behalf of others similarly situated, files this Motion for Leave to File Second Amended Complaint and respectfully asserts as follows." The Motion then stated that the "Plaintiffs sought to amend the Complaint to clarify their factual allegations in light of Auxili-

um's newly discovered evidence." The Motion made no mention of the fact that Parks had exhausted her administrative remedies and now sought to join Harris's Title VII and ADEA claims. The Second Amended Complaint did list Parks as a party. (Doc. No. 33 ¶ 3.) It stated that "Pursuant to the Equal Pay Act and the FLSA, Kathy Parks hereby consents to participate as a party plaintiff in this action. Ms. Parks has satisfied all other conditions precedent to this action, including exhausting her administrative remedies with respect to her claims against Auxilium Under Title VII and the ADEA." (Doc. No. 33 ¶ 37.)

The Court agrees with Defendant that, at this time, the only claims Parks has asserted are those brought pursuant to the EPA and the FLSA. While the Court realizes that this result seems overly technical, it observes that Parks failed, on three occasions, to notify Defendant, and this Court, of her intent to assert Title VII and ADEA claims.[7] First, the Second Amended Complaint, which superseded the First Amended Complaint, did not contain Parks' consent to join the suit with respect to the Title VII and the ADEA claims. It only stated that Parks consented to join the action "[p]ursuant to the Equal Pay Act and the FLSA." Second, Plaintiffs' Motion for Leave to Amend did not seek to assert new Title VII and ADEA claims on Parks' behalf. Third, as Defendant points out, Parks' name should have been listed in the caption of the Second Amended Complaint. While the caption included the term "similarly situated individuals," which describes Parks as a plaintiff in the EPA and the FLSA collective actions, it did not list her as an individual plaintiff At least one court of appeals has found that, in the context of the Federal Rules of Appellate Procedure, the phrase "similarly situated individuals," like the phrase "et al," is "ineffective to bring the [plaintiff] before [the] court." *OTR Drivers at Topeka Frito–Lay, Inc.'s Distribution Center v. Frito–Lay, Inc.,* 988 F.2d 1059, 1061 (10th Cir.1993). As a result, the Court will only consider Parks' EPA and FLSA claims.

■ Plaintiffs have moved to sanction Defendant's counsel for violating Rule 11 by making false representations to the Court regarding Parks' status as a party. Specifically, Plaintiffs objects to the following statement from Defendant's Motion for Summary Judgment:

Ms. Parks received her right to sue on April 29, 2008 but never refiled her Title VII or ADEA claims with this or any other court. Thus, Ms. Parks never took the action necessary to file her Title VII or ADEA claims and the time for doing so has long since passed.

(Doc. No. 76 at 7.) Plaintiffs further object to this statement from Defendant's Reply:

Ms. Parks received her right to sue on April 29, 2008, but never refiled her Title VII or ADEA claims with this or any other court.

(Doc. No. 86 at 5.) Plaintiffs argue that these statements are "clearly and know-

---

7. The Court notes the Eleventh Circuit's decision in *Marsh v. Butler,* 268 F.3d 1014, 1024 n. 4 (11th Cir.2001), in which it held that "To use the Rule 10 caption to create an ambiguity when the statement of the claim is itself not ambiguous is incorrect." In that case, the caption of the plaintiff's compliant stated that the plaintiff intended to sue a sheriff in her individual capacity, but the plaintiff's complaint did not state a claim against the sheriff in her individual capacity, as required by Rule

8. Nevertheless, the Eleventh Circuit still considered the plaintiff's arguments against the sheriff in her individual capacity because the parties and the district court had assumed the plaintiff stated a claim against the sheriff both in her official and individual capacity. The Eleventh Circuit noted that when, as in this case, the plaintiff's statement of her claim is somewhat ambiguous, the caption is one tool the court can use to resolve the ambiguity.

ingly false" and that the Court should impose appropriate sanctions on Defendant. Defendant responds that it has not made misrepresentations to this Court and that Plaintiffs did not follow the correct procedure for filing a Rule 11 motion. As outlined above, the Court ultimately agrees with Defendant that Parks has not *properly* refiled her Title VII or ADEA claims, since her claims had not been exhausted at the time Plaintiffs filed their First Amended Complaint. Also, Defendant is correct that Plaintiffs failed to follow the proper procedure for a Rule 11 motion. Rule 11(c)(2) requires that the party seeking sanctions serve the motion on the offending party, but refrain from filing the motion with the Court unless the offending party against whom sanctions are sought does not correct or withdraw the offending matter within twenty-one days after service. The Fifth Circuit has held that "[c]ompliance with the service requirement is a mandatory prerequisite to an award of sanctions under Rule 11," and sister courts have denied motions for sanctions because the moving party failed to comply with "the strict notice requirements of Rule 11" by filing the motion with the court before serving it. *Tompkins v. Cyr,* 202 F.3d 770, 788 (5th Cir.2000); *see also Bertaut v. Parish of Jefferson,* No. 02–2104, 2003 WL 21349664, at *1–2 (E.D.La. June 3, 2003) *and Riley v. City of Jackson,* 2 F.Supp.2d 864, 880 (S.D.Miss. 1997). Plaintiffs have not represented to the Court that they properly served a motion for sanctions on Defendant prior to filing their Sur–Reply with the Court. The Court will not, therefore, grant Plaintiffs' Motion for Sanctions.

## B. Defendant's Motion to Strike Plaintiffs' Summary Judgment Evidence and for Sanctions

The Court now turns to Defendant's Motion to Strike Plaintiffs' Summary Judg-

ment Evidence, specifically the affidavit of Caleb Price dated September 20, 2008 ("the Second Price Affidavit"). Price was employed by Defendant as an MSC from 2004 to 2007. (Doc. No. 91, Ex. B.) On May 6, 2009, Plaintiffs submitted the Second Price Affidavit with their Response to Defendant's Motion for Summary Judgment.

Plaintiffs had previously identified Price as a potential witness in their initial disclosures, filed pursuant to Federal Rule of Civil Procedure 26, which were served on Defendant on January 4, 2008. (Doc. No. 85, Ex. A ¶ I(3).) Defendant served its first Request for Production on May 27, 2008, in which it requested all documents that refer or relate to Plaintiffs' claims in this matter, including "[a]ll documents that refer or relate to any communication, conversation or correspondence that [plaintiffs] had with any individual, whether or not that individual is or was at any time employed by Auxilium, with respect to the allegations that form the basis of all claims contained in [Plaintiffs'] Complaint" and "[a]ll documents on which [Plaintiffs] intend[s] to rely in presenting [their] allegations or claims in this litigation." (Doc. No. 85, Ex. B ¶¶ 33, 40.) Plaintiffs did not produce the Second Price Affidavit.

On February 2, 2009, at Harris's deposition, Defendant asked what facts Price had that support Harris's claims. Harris responded by asking "Did he not submit an affidavit? I thought he submitted an affidavit." (Harris Dep. 123:1–25.) Harris did not produce the Second Price Affidavit during or after her deposition, and Defendant did not request the Second Price Affidavit because Price had submitted an earlier affidavit dated August 3, 2007 ("the First Price Affidavit").

Defendant first attempted to notice Price's deposition in February 2009. (Doc. No. 91, Ex. I.) Defendant attempted, on

several occasions in March 2009, to serve Price with a deposition subpoena at his home address and to contact Price by telephone. (Gold Aff. ¶ 9–13.)[8] Defendant contacted Plaintiffs' counsel, who claimed that neither he nor his clients had control over Price and had no obligation to assist in arranging the deposition. (Gold Aff. ¶ 15.) According to Defendant, Plaintiffs' counsel failed to provide possible dates for Price's deposition. (Gold Aff. ¶ 16.) Plaintiffs' counsel contends that he "fully cooperated" with Defendant's attempts to schedule Price's deposition—the record reflects that he informed Defendant that he was available on Defendant's proposed date for Price's deposition, March 17, 2009. (Doc. No. 91, Ex. J.) Defendant continued to attempt to schedule Price's deposition in May 2009, after the close of the discovery deadline. (Doc. No. 91, Ex. K.) Defendant informed Plaintiffs' counsel at this time that it believed Price was attempting to evade service of the deposition subpoena. (*Id.*) Plaintiffs represent that Defendant never forwarded Plaintiffs' counsel a deposition notice for Price in May 2009. After receiving Plaintiffs' Response to its Motion for Summary Judgment, Defendant asked Plaintiff's counsel when he received the Second Price Affidavit, but he refused to disclose this information, citing the attorney-client and work product privileges. (Gold Aff. ¶ 17.)

Plaintiffs' counsel argues that he submitted the First Price Affidavit, attesting to Defendant's discriminatory conduct, on August 8, 2007. (Doc. No. 91, Ex. B.) Price then filed suit against Defendant in the 298th District Court of Dallas County Texas on November 5, 2007; Defendant removed the case to the United States District Court for the Northern District of Texas (Doc. No. 91, Ex. D–E.) That case ultimately resulted in settlement. (Doc. No. 91, Ex. F.)

Defendant rejoins that Price's deposition should be stricken on a number of grounds, primarily because Plaintiffs did not supplement their discovery responses with the Second Price Affidavit. Defendant further requests that the court impose sanctions pursuant to Federal Rule of Civil Procedure 37 for this failure. Plaintiffs contend that the Second Price Affidavit is substantially similar to the First Price Affidavit, that Defendant has failed to depose Price in either the litigation in the Northern District of Texas or this case, and that Defendant will not be harmed by Plaintiffs' inclusion of the Second Price Affidavit in their Response.

The Court agrees with Plaintiffs that the First Price Affidavit is substantially similar to the Second Price Affidavit, and that it is not Plaintiffs' responsibility to compel third party witnesses to appear at depositions. Nevertheless, it is true that Plaintiffs failed to supplement their discovery responses with the Second Price Affidavit and that Defendant made good faith attempts to serve Price with a deposition subpoena in this lawsuit. Because Price evaded service of the deposition subpoena, depriving Defendant of the opportunity to counter the allegations he makes in the both the First and Second Price Affidavits, the Court will grant Defendant's Motion to

---

**8.** Specifically, Defendant sent a process server to Price's home address on several occasions. The process server confirmed with a neighbor that the home belonged to Price and that the vehicle in the drive way was driven by Price, but no one answered when the process server knocked on the door. Furthermore, when the process server attempted to call Price, a man answered the telephone but claimed that he was not Price. (Gold Aff. ¶¶ 9–13.) Defendant also called Price's former counsel on March 10, 2009 and inquired whether he would be representing Price at his deposition in this matter. (Gold Supp. Aff. ¶ 5, Ex. A.) Defendant did not, however, send a deposition notice or subpoena to Price's former counsel. (Wood Aff.)

Strike the Second Price Affidavit and will not consider it on summary judgment. As Defendant has failed to show, however, that it was harmed by Plaintiffs' failure to supplement their discovery responses with the Second Price Affidavit, which was substantially similar to the First Price Affidavit, or that Plaintiffs had any role in Price's evasion of service, the Court will not impose sanctions pursuant to Rule 37.

## C. Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir.2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir.2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## D. Compensation Claims

Plaintiffs claim that Defendant failed to pay them compensation equal to that of male MSCs and to female MSCs under the age of 40. Harris advances this claim under both Title VII and the EPA; Parks has joined Harris's EPA claims.

### 1. The Equal Protection Act

■■ The EPA requires that men and women who perform equal work receive equal pay, unless a difference in pay is justified by reasons other than their gender. *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir.1993). The statute reads, in pertinent part:

No employer having employees subject to any provision of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions....

29 U.S.C. § 206(d)(1). To establish a *prima facie* case, the plaintiff must offer proof (1) that the defendant is subject to the EPA; (2) that she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (3) that she was paid less than a male employee in that position. *Reznick v. Associated Orthopedics & Sports Medicine, P.A.*, 104 Fed.Appx. 387, 390 (5th Cir.2004) (citing *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (1987) *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268, (1989)).

■■ Once the plaintiff establishes a prima facie case, the burdens of production

and persuasion shift to the employer to demonstrate that the disparate wage payments were made pursuant to: 1) a seniority system; 2) a merit system; 3) a system which measures earnings by quantity or quality of production; or 4) a differential based upon any factors other than sex. 29 U.S.C. § 206(d)(1). In an EPA case, the defendant has the burden of persuasion if the plaintiff establishes a prima facie case. *Vogt v. Nationwide Mutual Insurance Company*, No. Civ. A.H–03–1586, 2005 WL 1830565, at *3 (S.D.Tex. Aug. 1, 2005) (citing *Plemer v. Parsons–Gilbane*, 713 F.2d 1127, 1136 (5th Cir.1983)). "Because the employer bears the burden of proof at trial, in order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense 'so clearly that no rational jury could find to the contrary.' " *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3rd Cir.2000).

■ Under the EPA, " 'wages' generally include all payments to . . . an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment . . . whether called . . . a bonus." *Kern v. GE Capital Information Technology Solutions*, No. Civ. A. 3:01–cv–2109–P, 2003 WL 22433817, at *5 (N.D.Tex. Feb. 19, 2003) (citing 29 C.F.R. § 1620.10 (2003)).[9] It is well established that, based on the C.F.R. definition of "wage," bonus payments and incentive compensation should be used to calculate wages for the purposes of an EPA claim. *Brown v. Clarke Power Services, Inc.*, No. 1:07–cv–1039, 2009 WL 1394839, at *10 (S.D.Ohio May 18, 2009) (collecting cases).

### a) Timeliness of Plaintiffs' EPA Claims

■ Claims under the FLSA, which includes EPA claims, must be filed within

two years after the cause of action accrues, or within three years if the alleged violation was "willful." *Ikossi–Anastasiou v. Board of Supervisors of Louisiana State University*, 579 F.3d 546, 552–53 (5th Cir. 2009) (citing 29 U.S.C. §§ 206(d), 201, *et seq.*, 255(a)). An employer willfully violates the FLSA if it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Because willfulness is a question of fact, summary judgment in favor of the employer is inappropriate if the plaintiff has introduced evidence sufficient to support a finding of willfulness. Where the plaintiffs have filed a collective action under 29 U.S.C. § 216(b), the action does not commence with respect to each individual plaintiff until he or she has filed with the court a consent to join the suit. *Coleman v. Circus Casinos, Inc.*, 2:04–CV–00747–PMP, 2006 WL 2591044, at *14 (D.Nev. Sept. 8, 2006) (citing 29 U.S.C. § 256).

■ Defendant argues that, because the Second Amended Complaint did not allege a willful violation with respect to Plaintiffs' EPA claims, the two year statute of limitations applies to these claims. As a result, Defendant argues that, since Harris filed this action on October 22, 2007, any EPA claim that proceeds October 22, 2005 is time-barred. Because Parks consented to join the action on March 10, 2008, Defendant contends that any EPA claim proceeding March 10, 2006 is time-barred. In response, Plaintiffs contend that the Court considered, and rejected, Defendant's argument in its Memorandum and Order on Defendant's First Motion for Summary Judgment ("First Order"). The only issue the Court

---

9. In their Response, Plaintiffs do not respond to Defendant's argument that the Court

should consider the gross annual pay of the MSCs.

considered in the First Order, however, was whether Plaintiffs' sales region was the relevant "establishment" for their EPA claims. (Doc. No. 58.) Plaintiffs also contend that the Second Amended Complaint states that "At all relevant times, Auxilium acted in bad-faith, intentionally, willfully, and/or with malice in discriminating and retaliating against Jan Harris, as alleged herein." (Pls.' 2d Amd. Compl. ¶ 26.) While this language clearly does not refer to Parks' EPA claim, Plaintiffs do argue in their Response to Defendant's Motion for Summary Judgment that Defendant recklessly disregarded its obligations under the EPA. (*See* Pls. Resp. at 25 ("The hiring, promotion, and pay disparities to which Auxilium subjected Mmes. Harris and Parks and other older female employees are no accident but directly attributable to the company's failure to formulate or implement even rudimentary EEO policies and procedures.... Auxilium had no written criteria for determining its MSCs' starting base pay.")) Because Plaintiffs have raised fact issues as to whether Defendant's failure to pay them equal compensation to male MSCs was willful, the Court will apply the three year statute of limitations.[10] Any of Harris's claims accruing before October 22, 2004 will be time-barred and any of Parks' claims accruing before March 10, 2005 will be time-barred.

### b) Plaintiffs' EPA Claims

Defendant argues that the male comparators identified by Plaintiffs actually earned less total compensation than they did. Specifically, Peterson, O'Keefe, Dawson and Wisniewski, male MSCs that Plaintiffs identify in their Second Amended Complaint, never earned more than either Plaintiff. Defendant further argues that Harris has intentionally omitted the earnings of other male MSCs in her own region that earned less compensation than she did, including Caleb Price, Frank Jerome Vascellaro, Joseph Jai Reed, and Thomas Drew Connell. Defendant also asserts that several of the male comparators identified in Plaintiffs' Second Amended Complaint did not hold the position of MSC for the relevant years, but Defendant does not provide the names of these comparators or evidence of the position they actually held.

Plaintiffs respond by arguing that the law of the case doctrine prevents summary judgment on Defendant's EPA claims. Plaintiffs contend that, in its First Motion for Summary Judgment, Defendant advanced the same arguments in support of its EPA claim, which the Court rejected. Further, Plaintiffs argue that their burden is merely to demonstrate that they were paid less than any one male employee in a similar position. In their Response, Plaintiffs have identified a number of male comparators who allegedly earned more gross income in 2006 and 2007 and higher base wages in 2004, 2005, 2006, and 2007.

### i. Law of the Case Doctrine

 The law of the case doctrine directs courts to refrain from revisiting

---

10. The Court's application of the three year statute of limitations is not in conflict with the cases cited by Defendant in its briefing. *See Coleman*, 2006 WL 2591044 at *14 (citing *Bonilla v. Las Vegas Cigar Co.*, 61 F.Supp.2d 1129, 1132–33 (D.Nev.1999) and *Perella v. Colonial Transit, Inc.*, 148 F.R.D. 147, 149 n. 2 (W.D.Pa.1991)). The instant case is distinguishable from *Coleman, Bonilla,* and *Perella.* The plaintiff in *Coleman* pled that the defendant had acted willfully but essentially waived this argument by failing to respond, in numerous rounds of briefing, to the defendant's argument that the two year statute of limitation should apply. In *Bonilla* and *Perella,* the plaintiffs not only failed to plead in their complaints that the defendants acted willfully, but they also failed to ever advance the argument in status conferences or briefing.

issues that were resolved earlier in the litigation. In civil cases, a district court is not precluded by the law-of-the-case doctrine from reconsidering previous rulings on interlocutory orders such as summary judgment motions, as those rulings are not final and lack res judicata effect. *United States v. Palmer*, 122 F.3d 215, 220 (5th Cir.1997) (citing *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir.1990), *overruled on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n. 14 (5th Cir.1994)). The Court rejected Defendant's First Motion for Summary Judgment on Plaintiffs' EPA claims because there were fact issues regarding the relevant "establishment" for selecting comparators. (Doc. No. 58.) For the purposes of the instant Motion for Summary Judgment, Defendant concedes that Plaintiffs can be compared with all MSCs, not merely those in their region. Given this concession, the Court will revisit its prior ruling.

### ii. Plaintiffs' Pay Relative to Comparators

The parties are essentially divided over whether Plaintiffs must demonstrate that they were paid less than every male MSC, or whether it is sufficient to show that they were paid less than some of the male MSCs. In support of their position that they must show only that they were paid less than one male comparator, Plaintiffs cite *Peters v. City of Shreveport*, 818 F.2d at 1148, and *Lenihan v. Boeing Co.*, 994 F.Supp. at 776. In *Lenihan*, the district court noted that "the plaintiff need not prove that she was paid less than every comparable male employer. It is enough for the plaintiff to show that there is discrimination in pay with respect to one employee of the opposite sex." 994

F.Supp. at 799 (internal citation omitted) (citing *EEOC v. White & Son Enter.*, 881 F.2d 1006, 1009 (11th Cir.1989)).

Defendant, on the other hand, directs the Court's attention to *Ambrose v. Summit Polymers, Inc.*, in which the Sixth Circuit stated that "[t]here is some case law suggesting that a plaintiff many not ignore lower-earning employees of the opposite sex when seeking to show inequality in pay—i.e., a plaintiff cannot establish a prima facie case by showing only that the highest earning employees of the opposite sex were paid more." 172 Fed.Appx. 103, 106 (6th Cir.2006) (citations omitted). The Sixth Circuit noted, however, that these cases used a methodology whereby the plaintiff's pay was compared to the average pay of the opposite-sex employees doing equal work. While Defendant has argued that Plaintiff was paid more than all other male MSCs in her region, it has not presented evidence comparing her wages to the average wage of all male MSCs, which Defendant has conceded, for the purposes of this Motion, is the relevant establishment. Defendant has only failed to offer evidence comparing Plaintiffs' pay with the average salary of similarly situated male MSCs. Defendant then cites *Strag v. Board of Trs.*, which held "[i]solated incidents of random comparisons demonstrating disparities in treatment may be insufficient to draw a prima facie inference of discrimination without additional evidence that the alleged phenomenon of inequality also exists with respect to the entire relevant group of employees." 55 F.3d 943, 950 (4th Cir.1995). *Strag*, however, is distinguishable; in that case, the plaintiff had only identified one male comparator, a male professor who taught in a different academic department than that of the plaintiff and who had more teaching responsibilities than the plaintiff.[11]

11. Defendant also cites *Vasquez v. El Paso* *County Community College Dist.*, 177 Fed.

Plaintiffs' Second Amended Complaint alleged that several MSCs received either a higher base salary or gross wages than Harris, including: Arthur Baldwin, Jim Hinchberger, Chris Noonan, Greg Sanchez, Daniel Diaz, Mesa Whitehurst, Kirk Nicholas, Richard Cain, Duane Moore, Nelson Morgan, Peter Debbas, Timothy O'Keefe, Joseph Dawson, Rick Clark, Nick Costa, Andres Gomez, Roman Wisniewski, Peter Wilkins, Dan Peterson, Craig Patzer, Steve Pagnotta, Jeff Seger, and Jeff Rosenstack. (Pls. 2d Amd. Compl. ¶ 14.) Plaintiffs also identify a number of female MSCs under the age of forty, or younger than Harris, who allegedly earned a higher base salary or gross wages than Harris. These comparators include Kristin Olschefkski, Jennifer Singler, Jessica Kenady, Allison Fielder, Kimberly Gallegos, Sarah Eckert, Susan Blom, Christina Myers, Carolyn Jackson, Alethia Colclasure, Jessica Pompa, Marina Elder, Heather Irwin, Robin Stone, Danielle Young, Robin Burger, Paula Sharp, Sarah Deegan, Bridgette Cravens, Paula Nicholas, and Susan Wasserman. (Pls. 2d Amd. Compl. ¶ 15.)

Defendant contends that, in 2004, Harris and Parks received more gross compensation than "all but two of the twenty-three male MSCs [Plaintiffs] identified"; in 2005, Harris's gross wages were "greater than all but four" and Parks' was "greater than all but eight"; in 2006, Plaintiffs' gross compensation was "higher than all but ten"; and in 2007, Harris's gross compensation was "higher than all but six" and Parks' was "higher than all but eight." (Doc. No. 99 ¶ 63.)

■ Defendant's arguments are ultimately not persuasive. In their Response, Harris has identified fifteen males who earned more gross compensation than she did in 2006, and Parks has identified fourteen. (Pls.' Amd. Resp., Doc. No. 100 at 25.) [12] Of these male employees, eleven are classified as "MSCs." Records for two of the men, Kirk Nicholas and Jeff Seger, classify them as working in "sales" and records for another two men, Peter Wilkins and Gregory Sanchez, have been redacted so that no information is available about their position. (*Id.*; *see also* Doc. No. 101 at Bates 8412, 8399, 8415, and 0552.) Harris has further identified eight men who earned more gross compensation than she in 2007. Of the men listed, five are classified as MSCs. Payroll records for one man, Daniel Diaz, indicates that he was an "MSS" and records for two men, Peter Wilkins and Richard Clark, have been redacted so that no information is available about their positions. (*Id.* at Bates 8473, 8574, and 5580.) As a result, Plaintiffs have sufficiently demonstrated, for the purposes of a prima facie case, that there were male MSCs who earned more gross compensation than they did in 2006 and 2007. Defendant has not argued that these men had responsibilities that varied from those of Plaintiffs. The Court therefore finds that Plaintiffs have created a prima facie case under the EPA.

■ Since Plaintiffs have demonstrated a prima facie case, Defendant must now

Appx. 422 (5th Cir.2006), which is distinguishable from the instant case because there were no similar employees of the opposite sex who were paid more than the plaintiff.

12. The Court notes that Plaintiffs have not produced evidence, and did not argue in their Response to the Motion for Summary Judgment, that the younger female MSCs identified in their Second Amended Complaint earned more than Plaintiffs within the relevant time period. The Court therefore considers Plaintiffs' ADEA compensation claim to be waived. Furthermore, while Plaintiffs' Response identified male MSCs with higher base salaries for the years 2004 and 2005, it did not present evidence comparing Plaintiffs' gross salaries to that of male comparators for these years.

show that the disparate pay resulted from (i) a merit system; (2) a seniority system; (3) a system which measures earnings by quantity or quality; (4) a differential based on any other factor other than sex. *Id.* (citing 29 U.S.C. § 206(d)(1)). Defendant claims that the variations in pay between Plaintiffs and other MSCs are based on the fourth prong, "any factor other than sex." "Any factor other than sex" is a general, catch-all exception to the application of the EPA. *Perales v. Am. Ret. Corp.,* 96 B.N.A. 1302, 2005 WL 2367772, at *21 (W.D.Tex.2005) (citing *Irby v. Bittick,* 44 F.3d 949, 956 n. 10 (11th Cir.1995)). The exception has been found to apply "when the disparity results from unique characteristics of the same job; from an individual's experience, training or ability; or from special exigent circumstances connected with the business." *Id.* (citing *Glenn v. General Motors Corp.,* 841 F.2d 1567, 1571 (11th Cir.1988), *cert. denied,* 488 U.S. 948, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988)).

Defendant contends that there are several components to an MSC's gross wages, including base salary, incentive compensation, and contest award money, and that an MSC's base salary is based on factors such as prior experience, tenure, performance, and the geographical location in which the employee works. (Roberts Aff. ¶¶ 3(a)-(b).) According to Susan Roberts, Defendant's Vice President of Human Resources, Defendant periodically reviews MSC salaries to ensure that they are equitable, based on those factors. (*Id.* at ¶ 1.) The RSD, along with the Area Sales Director ("ASD"), Kessig, and Roberts, plays a role in setting base salaries, and the RSD suggests equity increases and then gets the approval of Roberts, Kessig, and the ASD. (*Id.* at 172:3–15.) Roberts further testified that an MSC's incentive com-

pensation is governed by the terms of the incentive compensation plan for that particular year, which is based on sales achieved by the MSC. (*Id.* at ¶ 3(d).) Contest award money is governed by the rules for a particular contest. (*Id.* at ¶ 3(e).) Defendant also asserts that, based on this system, there were females who were paid more than both Plaintiffs and other males.

The Court does not find Defendant's justifications altogether convincing. While Roberts did testify, via affidavit, that Defendant reviews MSC salaries to ensure that they are equitable, in her deposition she admitted that a comprehensive review of the MSC salaries did not begin until 2008. (Roberts Dep. 119, January 21, 2009.) Both Kessig and Roberts admitted that the company did not have specific, written criteria in place for either equity increases or merit increases to an MSC's salary. (Kessig Dep. 172:22–173:22; Roberts Dep. 118:15–119:6.) While the Fifth Circuit has observed, in an unpublished opinion, that a defendant's criteria does not have to be in writing, *see Wiley v. American Electric Power Service Corp.,* 287 Fed.Appx. 335, 342 (5th Cir.2008) (not designated for publication), Defendant made no effort to apply its unwritten criteria to the male comparators that Plaintiffs identified in their Response. The hiring dates of these male employees range from December 9, 2002 (Jim Hinchberger) to June 30, 2005 (Peter Debbas), meaning that while some have more seniority and experience selling Testim than Plaintiffs, some do not. Most of the men identified were hired at the same time or after Plaintiffs, meaning they have an equivalent amount of tenure. In some cases, however, men who were hired after Plaintiffs have base pay that is more than $200 higher per pay period (Daniel Diaz in 2006 and Mesa Whitehurst in 2007).[13] (Doc.

13. The Court notes that it did not consider base pay for the purposes of Plaintiffs' prima

facie case—it mentions it here to point out that, without more explanation from Defen-

No. 101, Ex. A3–A4 at Bates 8349 and 8574.) Most of the male comparators earned more than Plaintiffs in incentive compensation in 2006; however, at least one male comparator, Craig Patzer, who earned only slightly more incentive compensation than Parks and slightly less than Harris, and who was hired after both Plaintiffs, still earned a higher gross salary than both Plaintiffs. (Doc. No. 101, Ex. A3 at Bates 8404.)

Furthermore, Plaintiffs have created a fact issue regarding the disparities between their pay and that of their male comparators for 2007 based on Defendant's implementation of a quota system that was tied to the amount of incentive compensation MSCs could earn. Defendant argues that it did not start using the quota system until 2007, and that Plaintiffs almost met their quotas in 2007 despite the fact that both were on extended leave during the year. Finally, Defendant contends that Michael Waskom, a male employee under the age of forty, had a quota that required him to sell 2500 more boxes of Testim than Jan Harris. Defendant asserts that the differences in the quotas did not result in a difference in pay.

Roberts confirmed in her deposition that she had no role in setting quotas. (Roberts Dep. 116:1–8.) Further, she did not know if Defendant had any controls in place to ensure that the quota program was fair and non-discriminatory. (*Id.* at 51:11–17.) Instead, Hatten set the quotas for the MSCs in his region. (Parks Dep. 181:5–15.) Defendant did not identify which method, if any, Hatten used to determine the quotas.[14] Harris testified that an MSC's bonus was directly correlated to his or her quota, and that women over 40 had the higher quotas, no matter which territory they were in. Indeed, based on the compensation data provided by the parties, Harris had the highest quota in her region. (Doc. No. 77, Ex. B–8 at Bates 15474.)[15] Parks has a quota that is higher than two of the three male MSCs listed in the document. (*Id.* at 15473–15474.) While Defendant does identity one male MSC, Waskom, who had a higher quota than Harris, his territory is listed as "Beverley Hills" and Defendant has not asserted that he was also supervised by Jeffrey Hatten. (Doc. No. 77, Ex. B–8 at Bates 15391.) Harris's replacement, a male, has a lower quota and a higher base salary than Harris. (*Id.* at 171:19–23.) Given that Defendant has the burden of persuasion, and viewing all of the facts in the lights most favorable to Plaintiffs, the Court finds that Harris and Parks have created material fact issues as to whether Defendant violated the EPA by failing to pay them comparable salaries to male MSCs.

### 2. Harris's Title VII Compensation Claim

■ Title VII wage discrimination claims generally parallel that of an EPA violation. *Vogt*, 2005 WL 1830565, at *3 (citing *Siler–Khodr v. Univ. of Texas Health Science*, 261 F.3d 542, 546 (5th Cir.2001)). Unlike an EPA claim, however, to prevail under Title VII, a plaintiff must prove discriminatory intent. *Id.* (cit-

---

dant, it is difficult to reconcile the pay differentials between Plaintiffs and some of the male comparators.

**14.** In her affidavit, Roberts testified that the quotas were based on territory, market share, and volume, but the record indicates that Hatten, not Roberts, set the quotas.

**15.** The Court notes that the quota information included in Exhibit B–8 could be incomplete. The Court made its determination that Harris had the highest quota in the region by comparing her region number, 204, with that of other MSCs listed in the document. Nonetheless, this evidence is sufficient to create a fact issue for the purposes of summary judgment.

ing *Lenihan v. Boeing Co.*, 994 F.Supp. 776, 797 (S.D.Tex.1998)).

For Title VII compensation claims, the fourth prong of the *prima facie* case requires the plaintiff to demonstrate that similarly situated males were treated differently under nearly identical circumstances. *Minor v. Alcatel USA Resources, Inc.*, No. 4:05–cv–339, 2007 WL 1342536, at *4 (E.D.Tex. May 1, 2007) (citing *Ward v. Bechtel Corp.*, 102 F.3d 199, 200 (5th Cir. 1997)). If the defendant is able to state a legitimate, non-discriminatory reason for the employment action, the plaintiff is left to prove that the defendant acted with discriminatory intent. *Hofmister v. State Dep't of Health*, 53 F.Supp.2d 884, 889 n. 11 (S.D.Miss.1999) (citing *Plemer*, 713 F.2d at 1131–32). At this point, the Title VII defendant does not have the burden of persuasion; it "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Plemer*, 713 F.2d at 1136. If the defendant carries this burden, the plaintiff then bears the "ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (citation omitted). In a Title VII case, the burden of persuasion always remains with the plain-

tiff. *Id.* This burden is lighter than that the defendant must discharge in the EPA context, where the defendant has both the burden of proof and the burden of persuasion.

 In this case, Harris has established a prima facie case that she was not paid equal compensation to similarly situated male employees.[16] Defendant has created a fact issue regarding its motivations for paying Harris less than its male employees—namely, it asserts that MSC salaries have a number of different components, including base salary, incentive compensation, and bonuses. The base salaries are determined by the MSC's experience, tenure, and geographic location. Hatten testified that variations in the quotas were based on an MSC's experience level. Assuming for a moment that these assertions are sufficient to discharge Defendant's burden under Title VII, Harris does not mention her compensation claim in her Response or argue that Defendant's proffered explanation is pretext. The Court will therefore grant summary judgment as to Harris's Title VII compensation claim.[17]

### E. FLSA Claims

#### 1. Administrative worker exemption

 Defendant first contends that it is not obligated to pay MSCs overtime because they fall under the administrative work exemption of the FLSA. The FLSA provides that "no employer shall employ any of his employees for a workweek long-

---

**16.** In its briefing on Harris's Title VII claim, Defendant renews its argument that Harris was paid more than some other male MSCs. Defendant cites *Hein v. Oregon College of Education*, a Ninth Circuit case in which the district court, in deciding the plaintiff's EPA claim, excluded one of the proffered comparators because he earned less than the plaintiff. 718 F.2d 910 (9th Cir.1983). That is not the issue before the Court. While Defendant has

demonstrated that Harris did earn more than some of her male counterparts, Plaintiffs have also shown that there were some male MSCs who earned more than they did.

**17.** The Court has found that Parks has not properly filed her Title VII or ADEA claims in this Court. Even if her claims were properly before the Court, she has also failed to offer any evidence of pretext.

er than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). An employer claiming an exemption bears the burden of proving that the exemption is valid. *Heidtman v. County of El Paso,* 171 F.3d 1038, 1042 (5th Cir.1999). In light of the FLSA's broad remedial aims, the exemptions from the FLSA's coverage must be narrowly construed against the employers seeking to assert them. *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960). The employer must prove that the employee falls "plainly and unmistakably within the terms and spirit" of the exemption. *A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945). The inquiry into an employee's exempt status is "intensely factbound and case specific." *Dalheim v. KDFW–TV,* 918 F.2d 1220, 1226 (5th Cir.1990).

Employees who occupy administrative and executive positions do not need to be paid overtime. *See* 29 U.S.C. § 213(a)(1). An employee in an administrative capacity is one:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week ...;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's-customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

The actual day-to-day job activities of the employee are relevant to determining whether the employee is exempt under the FLSA, not the labels the employee or the employer places on those duties. *See, e.g., Tyler v. Union Oil Co. of Calif.,* 304 F.3d 379, 404 (5th Cir.2002); *Kohl v. Woodlands Fire Department,* 440 F.Supp.2d 626, 637 (S.D.Tex.2006); *Schaefer v. Ind. Mich. Power Co.,* 358 F.3d 394, 400 (6th Cir. 2004); 29 C.F.R § 541.2. "The essence of the test is to determine the employee's chief or principal duty.... The employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time." *Dalheim v. KDFW–TV,* 918 F.2d 1220, 1227 (5th Cir.1990) (internal citations omitted). However, if such employees are closely supervised and earn little more than the nonexempt employees, they generally do not satisfy the primary duty requirement. 29 C.F.R. § 541.700(c).

"Time is not the sole test, and employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. 541.700(b). The fact that an employee spends 65 to 90 percent of his time on nonexempt tasks "is not a controlling factor under the regulations" for determining whether the employee was exempt from the FLSA's overtime. *Spinden v. GS Roofing Products Co., Inc.,* 94 F.3d 421, 427 (8th Cir.1996); *Murray v. Stuckey's, Inc.,* 939 F.2d 614, 618 (8th Cir.1991), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992); *Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104, 1113 (9th Cir. 2001). That the majority of an employee's time "was not spent [on exempt tasks] ... does not preclude the determination that [his] primary duties consisted of the administration of the general business operations ... such that the administrative and supervisory duties performed by [the employee] were of principal importance to [the employer], as opposed to those collat-

eral tasks which may have taken more than fifty percent of [his] time." *Lott v. Howard Wilson Chrysler–Plymouth, Inc.,* 203 F.3d 326, 332 (5th Cir.2000).

In order to qualify for the administrative exemption, an employee's primary duty must be "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Thus, where an employee is primarily involved in producing the product of the company rather than "servicing" the company, the administrative exemption does not apply. "Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as ... accounting; budgeting; auditing; .... quality control; purchasing; procurement; ... safety and health; personnel management; human resources; ... government relations ... legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b).

In promulgating the 2004 FLSA regulations, however, the Department of Labor explained that the distinction between production and administrative tasks is but one factor in the ultimate analysis of whether the employee's work is directly related to general business operations. Department of Labor, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule, 69 Fed. Reg. 22121, 22141 (April 23, 2004) (citing *Bothell v. Phase Metrics, Inc.,* 299 F.3d 1120, 1127 (9th Cir.2002)). Department of Labor regulations provide several factors to consider in determining whether the employee at issue exercised independent discretion and judgment:

1. whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;

2. whether the employee carries out major assignments in conducting the operations of the business;

3. whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;

4. whether the employee has authority to commit the employer in matters that have significant financial impact;

5. whether the employee has authority to waive or deviate from established policies and procedures without prior approval;

6. whether the employee has authority to negotiate and bind the company on significant matters;

7. whether the employee investigates and resolves matters of significance on behalf of management;

8. and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. 541.202(b).

Federal courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment, although a case-by-case analysis is required. *See McKee v. CBF Corp.,* 299 Fed.Appx. 426, 429–30 (5th Cir.2008) (upholding administrative exemption where employee supervised five others, screened employees for hire, decided which of a list of tasks would be handled by outside contractors, and ordered alcohol totaling over $500,000 per year); *Bondy v. City of Dallas,* 77 Fed.Appx. 731, 733 (5th Cir.2003) (upholding administrative exemption where event coordinators decided

whether a client's proposal complied with policies and procedures, recommended that management excuse the noncompliance, and made suggestions to revise policies and procedures); *Cowart v. Ingalls Shipbuilding, Inc.,* 213 F.3d 261, 267 (5th Cir.2000) (upholding administrative exemption where employees planned in detail all production work requirements in the shipyard, ensured that craft workers had adequate information, established priorities for assigned work, and provided guidance to finish work on schedule).[18] *Cf. Heidtman,* 171 F.3d at 1042 (reversing finding of administrative exemption where employees spent considerable time compiling names of prospects to complete their databases, calling prospects in these databases, sending them brochures, and the employees required permission to take potential clients out to a meal), *Roberts v. National Autotech, Inc.,* 192 F.Supp.2d 672, 679 (N.D.Tex.2002) (holding employee's duties did not fall within administrative exemption where plaintiff handled customer complaints, ensured the store was running properly and profitably, scheduled employees, and oversaw daily operations, but could not grant vacation requests, deviate from normal refund procedures, or resolve serious internal disputes). In addition, final decision-making authority over matters of consequence is unnecessary. *See, e.g., Tyler v. Union Oil Co. of California,* 304 F.3d at 403.

An employee may exercise discretion even if his decisions or recommendations are reviewed by a senior management official and occasionally revised or reversed. *Cheatham v. Allstate Ins. Co.,* 465 F.3d 578, 585 (5th Cir.2006); 29 C.F.R. § 541.202(c). In addition, employees may still exercise discretion and independent judgment even if they consult manuals or guidelines. *Id.* at 585.

Other district courts that have considered the issue have found that the administrative exemption applies to pharmaceutical sales representatives. In *Amendola v. Bristol–Myers Squibb Company,* the district court considered whether a drag company's representatives who promoted the company's products to doctors in the field were covered by the administrative exemption. 558 F.Supp.2d 459, 476 (S.D.N.Y.2008). In describing the representative's status under the first prong of the exemption, the district court stated that:

> BMS has shown that its PRs perform non-manual work directly related to the general business operations of the company. Each PR represents BMS in meetings with medical providers and promotes BMS drugs. The success of BMS's business depends in part on the success of its PRs in educating physicians about BMS drugs. Thus, the nature of the work performed by PRs is directly related to BMS's management or business operations.

*Id.* at 476–477. The district court then found that the defendant was likely to satisfy the second prong of the administrative exemption as well. In deciding that the company's representatives exercised the discretion and independent judgment required by the statute, the district court considered the fact that the representatives tailor the content of their presentations to each medical provider based on the provider's patient populations, prescription practices, and other factors, and

---

18. *See also, Haywood v. North American Van Lines, Inc.,* 121 F.3d 1066, 1071–73 (7th Cir. 1997) (upholding administrative exemption where employee could negotiate on behalf of the employer with some degree of settlement authority, conduct independent investigation and resolution of issues without prior approval, and had the authority to waive or deviate from established policies and procedures without prior approval).

independently decide what promotional message will be most effective. The representatives decide whether to seek a "commitment" from a physician, and they each manage their call lists, exercising their own judgment in deciding how often to visit a doctor and whether to add new providers to their lists. They also determine how to manage their own promotional budgets. "Each of these daily acts reflects 'the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered,' and each of these decisions is made 'free from immediate direction or supervision.'" *Id.* at 477. The district court concluded that "these areas of discretion and independent judgment involve 'matters of significance' because, in making each of these decisions, PRs seek to influence prescription writing practices—a matter of great consequence to BMS's business." *Id.*

The District of New Jersey then followed the *Amendola* court in finding that pharmaceutical representatives should be classified as administrative workers for the purposes of FLSA. *Smith v. Johnson and Johnson,* No. 06–4787, 2008 WL 5427802, at *10–12 (D.N.J. Dec. 30, 2008). In *Smith,* the company's representatives had slightly less autonomy then the representatives in *Amendola,* largely because, like Plaintiffs in the instant case, they could not, on their own initiative, choose to see new physicians in order to increase the number of prescriptions written. Despite this difference, the *Smith* court still found that the representatives performed tasks sufficiently within the scope of the administrative exemption regulations. "Plaintiff's promotion and marketing of [the drug] to physicians is an example of the kind of role that, while it does not dictate corporate marketing policy, actually drives the market demand, and therefore substantially affects operation of 'a particular segment of the business.'" 2008 WL

5427802 at *10 (citation omitted). The *Smith* plaintiff was similar enough to the representatives in *Amendola* with respect to the "general nature of the work she performed, the lack of day-to-day supervision from her manager (who accompanied her only monthly), and the manner in which she sought to have an impact on growing the market share of [the drug] in her territory, clearly a matter of importance to [the Defendant]." *Id.* at *11.

In *In re Novartis Wage and Hour Litigation,* 593 F.Supp.2d 637, 641 (S.D.N.Y. 2009), the plaintiffs were pharmaceutical representatives whose primary function was to call on physicians and give them information about the defendant company's drugs. As in the instant case, since the drugs were regulated by the FDA, the defendant prepared scripts and related materials for the representatives to use when delivering a "core message" about the defendant's products to physicians. The representatives were not allowed to go beyond the boundaries of the message created by defendant. The defendant also provided the representatives with drug samples, pamphlets, clinical studies, visual aids, and other materials, and instructed the representatives on how to use these materials during their visits. The representatives had the discretion as to when and how to use these materials, however, and they planned their daily call schedules and decided when to visit the doctors on their target list. The defendant set parameters for the representatives to tailor presentations to each physician based on such variables as the amount of time the physician allocates to meeting with the representative, their prescribing habits, and the representatives assessment of the physician's personality. Representatives were also given budgets and allowed to plan speaker events within certain guidelines created by the defendant. 593 F.Supp.2d at 641–642. Citing *Amendola,*

the district court found that the defendant had satisfied the first prong of the exemption, because the representatives performed non-manual work and because "[their] success in obtaining prescriptions is critical to [the defendant's] business." *Id.* at 656.

The *In re Novartis* court also found that the defendant had satisfied the second prong of the exemption because its representatives were allowed to exercise considerable discretion in carrying out their duties. In response to the plaintiff's arguments that they were "robots" or "automatons" with no room to act with discretion or independent judgment within the stringent confines of the defendant's regulations, the district court stated: "[a]t the bare minimum, [representatives] must be capable of tailoring their presentation to a given timeframe—deciding how best to convey the 'core message' in a manner that will have the desired effect on the physician. Such a decision involves making an independent judgment, free of direct oversight, even if [the defendant] has provided [the representatives] with guidelines for conveying certain information in a certain manner." *Id.* at 657.

Although the facts of these cases are overwhelmingly similar to those before the Court, Plaintiffs make no effort to distinguish them. In the only case Plaintiffs cite in support of their position, *Ruggeri v. Boehringer Ingelheim Pharmaceuticals, Inc.,* the district court recognized "it was at least a possible conclusion" for jurors to find that the administrative workers exemption applied to the plaintiff; however, in that case, the district court resolved that there were too many fact issues regarding whether the plaintiff's work directly related to the defendant's business operations and whether the plaintiff exercises discretion with respect to "matters of significance." 585 F.Supp.2d 254, 266–267 (D.Conn.2008).

Plaintiffs do argue that the administrative exemption does not apply to MSCs because their primary duty does not involve the performance of office or non-manual work directly related to Defendant's management or general business operations, and also does not include the exercise of discretion and independent judgment with respect to matters of significance. To support this assertion, Plaintiffs cite Roberts's deposition testimony, in which she stated that "[n]o one coming from an MSC position would have managerial experience." (Roberts Dep. 82–83.) Plaintiffs also assert that Roberts testified that MSCs are "extensively supervised with respect to significant matters."

The record belies Plaintiffs' assertions. For instance, Plaintiffs introduce an email from Mark Mosebrook to Jeff Mastrangelo, dated August 24, 2006, in which Mosebrook recounted his recent days in the field with Harris, Parks, and Paula Sharp:

Every member of the Houston area is very solid in all facets of their respective territories. Each of the ladies has a thorough understanding of their territories and how to run them like a business. All three do complete office calls on each visit, they have a relationship with every member of the staff and all expressed to me that their philosophy is to treat every member of the office as if they write the prescription as you never know who is influencing the physician. Every physician we visited immediately knew each by face and were engaging, saying, "I know, write Testim" and they would subsequently engage them in conversations on the benefits of Testim.

Each member is very outgoing and looks for creative ways to increase business: whether it is with coffee or original candies they are always looking for ways to separate themselves from their competitors. Each office is very accommodat-

ing to them as they wave them back with no hesitation, not once did we sit in a waiting room over the three days due to the fact that they have built such great relationships with the entire office staff. I heard on numerous occasions from the physicians that they valued the Auxilium MSCs due to the fact that they brought true value to their office.

Their technical knowledge is fantastic for what little training each received from the home office. Each one has gone above and beyond to continue to teach themselves about the disease state, how each product works and how physicians treat low Testosterone. In Jan's case, she has immersed herself in the HIV/AIDS community and really taken a sense of ownership in the disease state and taught herself all there is to know about the disease as well as forged relationships with many of the key advocates both in and out of the medical community. Jan single-handedly worked with Nelson Vergel to have Testim be the lead product in his upcoming book which is highly distributed through the gay community. In my estimation, Jan would make a fantastic HIV/AIDS specialist.

Kathy has a background in nursing and is very well versed in communicating the key selling points to all of her physicians on every call and subsequently closes for the business. Her physicians and nurses hold her in very high regard and in every office they welcomed Kathy's information as each felt it was beneficial. (Doc. No. 84, Ex. I.) This email indicates both that MSCs performed a function that was directly related to Defendant's general business operations—selling and promoting Testim—and that they exercised discretion in how and when to approach the physicians that had the power to prescribe the drug. Defendant's sole product is Testim, and its financial success hinges on an MSCs ability to convince physicians to pre-

scribe the drug. Furthermore, Plaintiffs' argument that they were "heavily supervised" is contradicted by their own testimony, in which they stated that the majority of time they visited physicians they did so alone. Parks' testimony revealed that she made decisions about which promotional materials to use at which visits depending on the physician and the amount of time allotted for the visit. She employed her own judgment with respect to the sample form, testifying that she used it even though Defendant preferred that physicians write a prescription, and that sometimes she used it merely to gain access to the physician. Parks used candy, planned events, and developed a rapport with the staff and doctors to increase her access to the office. Harris admitted that her success in selling Testim was due, at least in part, to her own intelligence. Like the *Amendola* court, this Court refuses to believe Plaintiffs' arguments that they their role was limited to simply regurgitating the information given to them by Defendant. Instead, Plaintiffs performed an important function directly related to Defendant's business operations, and they did so while exercising discretion about matters of significance—namely, how to sell and promote Defendant's product.

### 2. Outside Sales Exemption

Defendant also contends that Plaintiffs should be considered "outside salespeople" and are therefore exempt from the terms of the Act. Plaintiffs respond that they did not act as salespeople but only engaged in promotional work.

Outside salespeople, as defined by the Department of Labor, are specifically exempted from this provision. 29 U.S.C. § 213(a)(1). The Department of Labor defines an "outside [salesperson]" as any employee who (1) is employed for the purpose of and who is customarily and regularly

engaged away from his employer's place of business in (a) making sales or (b) obtaining orders or contracts for services or for the use of facilities, and (2) does not perform work other than this for more than twenty percent of the hours worked by nonexempt employees of the employer." 29 C.F.R. § 541.500. The FLSA defines "sale" or "sell" as "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). The Department of Labor regulations distinguish non-exempt promotional work as that which is "incidental to sales made, or to be made, by someone else...." 29 C.F.R. § 541.503(a).

In the Court's First Order, it discussed the *Amendola* court's finding that pharmaceutical representatives merely performed promotional work. That court, analyzing the distinction between "promotional" and "sales," found that the representatives were not to be considered outside salespeople. The court concluded that "influencing physicians to prescribe BMS drugs to patients or even obtaining non-binding commitments from the physicians to do so does not constitute a "sale, exchange, contract to sell, consignments for sale, [or] shipment for sale."" *Id.* at 470–471. The court described its conclusion as "unsurprising" because BMS agreed that the medical providers did not purchase BMS products from PRs and that federal law prohibited PRs from selling pharmaceuticals products. The Court noted that it found this reasoning persuasive but concluded that the parties had not presented enough facts regarding Defendant's business model for the Court to conclusively hold that the outside sales exemption does not apply.

In the instant motion, Defendant draws the Court's attention to more recent case law discussing whether or not pharmaceutical sales representatives should be considered outside salespeople. Plaintiff responds first by arguing that the law of the case doctrine prevents the Court from revisiting the issue. As discussed above, the Court is not bound by the law of the case doctrine in relation to non-final judgments, including summary judgment decisions. Because both parties have produced both new facts and new law in the briefing on Defendant's Second Motion for Summary Judgment, the Court will reconsider its earlier, interlocutory decision.

As a preliminary matter, the Court notes that the law on this issue is anything but uniform. *See Kuzinski v. Schering Corporation*, 614 F.Supp.2d 247, 250 (D.Conn.2009) (collecting cases from district courts reaching conflicting conclusions about the status of pharmaceutical sales representatives as outside salespersons and noting the lack of appellate authority on the issue). At least two appellate courts are currently considering whether pharmaceutical sales representatives are outside salespersons for the purposes of the exemption. *See id.*; *Smith v. Johnson and Johnson*, Nos. 9–1223 and 9–1272 (3d Cir. Jan. 29, 2009 and Feb. 3, 2009). The Ninth Circuit is considering a similar exemption under California law. *See D'Este v. Bayer Corp.*, 565 F.3d 1119 (9th Cir.2009).

In this Court's First Order, it considered the reasoning of *Amendola*, as discussed above. Since it was decided, three other district courts have reached the same conclusion as *Amendola*. In *Ruggeri*, the district court rejected the defendant's argument that its pharmaceutical sales representatives fell within the exemption by marketing the drugs to physicians who write the prescription that ultimately determines which drug the consumer will buy. 585 F.Supp.2d at 266–267. One month later, the *Smith* court held that the outside sales exemption did not apply to pharmaceutical sales

representatives. 2008 WL 5427802 at *7. Citing *Ruggeri*, the *Smith* court also concluded that pharmaceutical sales representatives had no capacity to "actually make sales" as required by the regulations.

Then, in February 2009, the district court reached the opposite conclusion in *In re Novartis*, 593 F.Supp.2d at 637. In that case, the defendant argued that the prescriptions which representatives seek to elicit from the physicians they visit are "in essence, orders for NPC drugs to be used by the patients in purchasing NPC's drugs from pharmacies. Without prescriptions, patients cannot buy drugs and there is no sale." *Id.* at 648. Acknowledging that FLSA coverage exemptions must be strictly construed, the district court nonetheless observed that "[a]dopting Plaintiff's constricted reading of the FLSA ignores the Act's spirit, purpose, and goals." It then cited *Jewel Tea Co. v. Williams, et al.,* in which the Tenth Circuit offered an explanation for the rationale behind the outside sales exemption:

> The reasons for excluding an outside sales[person] are fairly apparent. Such sales [people], to a great extent, work individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

118 F.2d 202, 207–208 (10th Cir.1941). The *In re Novartis* court also referenced

the DOL's 2004 Final Rule, which observed that the white collar exemptions were created because these employees "typically earned salaries well above the minimum wage, and they were presumed to enjoy other compensatory privileges such as above average fringe benefits and better opportunities for advancement ...." *Novartis*, 593 F.Supp.2d at 649 (citing 69 Fed. Reg. at 22124). Work done by these employees "was difficult to standardize to any time frame ... making compliance with the overtime provisions difficult ...." *Id.*

The *Novartis* court then turned to the issue of whether the work done by pharmaceutical representatives meets the definition of "sales" found in the regulations. "[C]ourts have taken into account the characteristics of the industry in question when determining the applicability of the outside sales exemption." *Novartis*, 593 F.Supp.2d at 649. The court then observed that the FDA regulates the pharmaceutical industry, which includes prohibiting representatives from selling drugs to physicians. Furthermore, doctors have an ethical obligation to prescribe only drugs suitable for a patient's medical needs. "Nevertheless ... the physicians called upon by the Reps ultimately control the purchase of NPC products by writing prescriptions .... [P]hysicans are ... integral to sales ... because, absent a prescription from a doctor, the patient end-users of NPC drugs are not able to obtain those drugs." *Id.* at 650. The court therefore concluded that "Reps make sales in the sense that sales are made in the pharmaceutical industry." *Id.*

A few weeks later, another district court, citing *Jewel Tea* and *In re Novartis* also found that sales representatives were covered by the outside salesperson exemption. *Yacoubian v. Ortho–McNeil Pharmaceutical, Inc.,* No. 7–cv–00127, 2009

U.S. Dist. Lexis 27937 (C.D.Cal. Feb. 6, 2009). Like *In re Novartis,* the *Yacoubian* court noted the lack of appellate authority on the issue and cited *Medtronic v. Gibbons,* 527 F.Supp. 1085 (D.Minn.1981), *aff'd* 684 F.2d 565 (8th Cir.1982). In that case, the Eighth Circuit affirmed the district court's decision that physicians were the actual customers targeted by representatives working in the medical device industry, even though the physicians were not actually purchasing the devices. The district court in *Baum v. AstraZeneca* subsequently joined the ranks of the courts finding that pharmaceutical sales representatives make sales when deciding a case brought under the Pennsylvania Minimum Wage Act, which mirrors FLSA. 605 F.Supp.2d 669 (W.D.Pa.2009). The *Baum* court concluded that "in the pharmaceutical industry, the strongest evidence for sales activity and being employed for the purpose of making sales, is that the employee obtains commitments from physicians. [The plaintiff] did precisely that: after careful preparation and planning, she skillfully asked physicians for commitments to prescribe [the drug] in appropriate situations." *Id.* at 680. Finally, in *Kuzinski,* the same district court that decided *Ruggeri* stood by its earlier reasoning and criticized the *In re Novartis* decision. 604 F.Supp.2d 385 (D.Conn.2009). The *Kuzinski* court principally took issue with *In re Novartis's* departure from a strict interpretation of "sales" as defined in the CFRs.

The Court notes that it has already found that MSCs are not covered by FLSA because of the administrative sales exemption. It further observes that, although it is a close call, the reasoning of the *In re Novartis* court is ultimately somewhat more persuasive than that of the *Kuzinski* court. While it is true that FLSA's exemptions must be strictly construed, given, the historical purpose of the statute, and the unique nature of the phar-

maceutical industry, MSCs make "sales" by securing a physician's commitment to write a prescription. While the commitment may later be broken, MSCs are measured in terms of the number of prescriptions actually written for the purposes of satisfying quotas and earning incentive compensation. Harris's own testimony suggests that MSCs are ranked, and receive "President's Club" status, based on actual sales, or prescriptions written, in their territory. Moreover, MSCs spend the majority of their time in the field and keep irregular working schedules, two elements of the classic criteria for outside salespersons as described by the *Jewel Tea* court. Because MSCs do not keep track of their hours and perform variable task on a day to day basis, it would be logistically difficult to determine their "overtime" hours. The Court therefore finds that MSCs fall under the FLSA's outside salesperson exemption.

### F. Additional Title VII Claims

#### 1. Title VII Standard

"Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin." *Grimes v. Texas Dep't of Mental Health,* 102 F.3d 137, 140 (5th Cir.1996). Title VII claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). When a plaintiff alleges disparate treatment, "liability depends on whether the protected trait actually motivated the employer's decision." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); *Reeves,* 530 U.S. at 141, 120 S.Ct. 2097. Title VII sex discrimination claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411

U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668(1973):

> McDonnell Douglas instructs that the plaintiff must first establish a *prima facie* case of [race].... Once the plaintiff presents a *prima facie* case, the defendant must then articulate a legitimate, nondiscriminatory reason for the questioned employment action.... If the defendant is able to do so, the burden shifts back to the plaintiff to produce evidence that the defendant's articulated reason is merely a pretext for discrimination.

*Bodenheimer v. PPG Industries, Inc.*, 5 F.3d 955, 957 (5th Cir.1993); *Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 40 (5th Cir.1996); *Nasti v. CIBA Specialty Chemicals Corp.*, 492 F.3d 589, 593 (5th Cir.2007). If the plaintiff can establish that defendant's articulated reason is pretext, and *if the prima facie* case is sufficiently strong, a trier of fact may be able to conclude that, without additional evidence, the employer unlawfully discriminated. *See Reeves*, 530 U.S. at 148, 120 S.Ct. 2097 (finding that the district court properly submitted the case to the jury). The plaintiff may also show that the defendant's articulated reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic ("mixed motive alternative"). *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (holding that a Title VII plaintiff need not proffer direct evidence of discrimination to pursue a mixed-motives analysis); *Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir.2004). If a plaintiff shows that discrimination was a motivating factor in a mixed-motives case, defendant must then respond with evidence that the same employment decision would have been made regardless of discriminatory motivation. *Rachid,* 376 F.3d at 312 n. 8

(citing 42 U.S.C. § 2000e–2(m)). The employer's final burden "is effectively that of proving an affirmative defense." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir.2005).

## 2. Failure to Promote Claim

### a) Timeliness of Claims

Harris contends that Defendant violated Title VII and the ADEA by promoting less qualified men, and younger women, to positions that she sought. Defendant responds that all but one of Harris's failure to promote claims are time-barred. Because Texas offers an administrative mechanism to resolve employment discrimination complaints, a Title VII plaintiff must file a charge of discrimination with the EEOC within 300 days of learning of the alleged unlawful employment action. *Huckabay v. Moore,* 142 F.3d 233, 238 (5th Cir.1998). "Each discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113–114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). An EEOC complaint must be filed within 300 days of the discriminatory act. *Id.* "Discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." *Id.*

In her Second Amended Complaint, Harris identifies several such male and younger female comparators who were promoted. They include: Jeff Hatten, who was promoted to RSD on January 3, 2005, Lisa Miles, who was promoted to RSD on July 1, 2005, Jeff Rosenstack, who was promoted to RSD on September 26, 2005, Robin Burger, who was promoted to Marketing Development Manager on April 3, 2006, Sarah Degen, who was promoted to MDM on April 3, 2006 and RSD on September 11, 2006, Chris Noonan, who was promoted to RSD on September 11, 2006, Nelson Morgan, who was promoted to RSD on September 11, 2006, and Tom

Fucarile, who was promoted to RSD on October 6, 2006. Defendant argues that Harris was required to file suit within 300 days of the occurrence of each of these promotions. The Fifth Circuit has identified the employer's failure to promote the plaintiff as a "discrete act" that is actionable. *Newton v. Securitas Security Servs., USA, Inc.,* 250 Fed.Appx. 18, 20–21 (5th Cir.2007). As a result, Defendant argues, any promotion that occurred before October 31, 2006 is time-barred, meaning that the only promotion Harris can challenge is that Jim Hinchberger, who was promoted to RST on November 21, 2006 and to RSD on October 1, 2007.

As Harris points out, however, President Barack Obama recently signed into law the Lily Ledbetter Fair Pay Act of 2009, Pub.L. No. 111–2, amending 42 U.S.C. § 2000e–5(e) and 29 U.S.C. § 626 (Jan. 29, 2009) ("Fair Pay Act"), which overturned the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co.,* 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007) (holding that merely because a prior discriminatory decision reduces the amount of later paychecks does not mean that "each paycheck constitutes a new violation"). The Fair Pay Act amended both Title VII and the ADEA to read, in pertinent part:

> [A]n unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits,

or other compensation is paid, resulting in whole or in part from such a decision or other practice.

The FPA was enacted on January 29, 2009 and applies to "all claims of discrimination ... that are pending on or after May 28, 2007" and extends liability "for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful practices with regard to discrimination in compensation that occurred outside the time for filing a charge."

Harris argues that, as a result of the FPA, most of her failure to promote claims are now timely. In support of her argument, she cites, along with the legislative history of the FPA, a number of district court cases that have applied the FPA in order to revive a plaintiff's otherwise time-barred Title VII and ADEA claims. *See Gentry v. Jackson State University,* 610 F.Supp.2d 564, 566 (S.D.Miss.2009); *Rehman v. State University of New York at Stony Brook,* 596 F.Supp.2d 643, 651 (E.D.N.Y.2009); *Bush v. Orange County Corrections Dept.,* 597 F.Supp.2d 1293, 1295 (M.D.Fla.2009).[19]

District courts have indeed grappled with the reconciliation of the FPA's terms "compensation decision" and "other practices." Each of the cases Harris cites addresses the timeliness of the plaintiff's discriminatory compensation claim. In *Gentry,* the plaintiff was a female university professor who had been denied tenure and a related salary increase. The district court held that, while the defendant's decision to deny the plaintiff tenure was a "discrete act," it also denied the plaintiff a

**19.** Harris cites a number of comments from Senators Arlen Specter and Kay Bailey Hutchinson about the meaning of the term "other practice." The Court notes that it does not find legislative history a reliable tool for statutory interpretation. In the state-

ments Harris offers, however, Specter seems to be criticizing the term "other practices" as overly broad precisely because it could be construed to mean promotions and terminations, the meaning that Harris now urges this Court to adopt.

salary increase and was therefore a compensation decision. 610 F.Supp.2d at 564. Similarly, in *Gertskis v. New York City Dept. of Health and Mental Hygiene*, the court observed that "the crux of plaintiff's claims is that she received inadequate compensation after [the defendant's] repeated and alleged discriminatory failure to promote her to the Associate Chemist position." No. 07 Civ. 2235(TPG), 2009 WL 812263, at *4 (S.D.N.Y. March 26, 2009). The district court, citing the FPA, found that these decisions continued to affect the plaintiff until she began her leave of absence and therefore her claims were not barred.

A number of other district courts have distinguished failure to promote claims from compensation claims and found that, even after the enactment of the FPA, the failure to promote claims are still time-barred if the plaintiff does not file an EEOC complaint within 300 days of the discriminatory action. *See Vuong v. New York Life Insurance Company*, No. 03–cv–1075, 2009 WL 306391, at *7–9 (S.D.N.Y. 2009) (holding that, while the plaintiffs Title VII compensation claims were resurrected by the FPA, his failure to promote claims were not); *Grant v. Pathmark Stores, Inc.*, No. 06–Civ–5755, 2009 WL 2263795, at *7–9 (S.D.N.Y. July 29, 2009) (same); *Rowland v. Certainteed Corporation, et al*, No. 08–3671, 2009 WL 1444413, at *6 (E.D.Penn. May 21, 2009) (holding that, since the plaintiff's failure to promote claims were not ultimately related to compensation issues, their timeliness was unaffected by the FPA); *see also Richards v. Johnson & Johnson*, No. 05–cv–3663, 2009 WL 1562952, at *9 (D.N.J. June 2, 2009).

In *Rowland*, the district court held that the FPA "does not help Plaintiff here because she pressed no discriminatory compensation claim with respect to her failure to promote claim." 2009 WL 1444413 at *6. The plaintiff argued that she was subject to "ongoing discriminatory denial of the promotion to the [p]osition"; however, the district court held that this claim was not related to discriminatory compensation.

In Harris's Second Amended Complaint, she argues that Auxilium discriminated against her on the basis of gender with respect to her compensation and promotions. She details Defendant's "discrimination with respect to compensation" as paying higher base salaries to similarly situated male and younger female MSCs, awarding larger quarterly and annual bonuses to similarly situated male and younger female MSCs, and setting arbitrary sales quotas for female MSCs who are over 40 and penalizing them with respect to their performance reviews, and bonuses. (Pls. 2d. Amd. Compl. ¶ 13.) It was not until she filed her Response, after the passage of the FPA, that Harris claimed that "Auxilium denied Harris … promotions in July 2005 and April 2006, and October 2006 that would have resulted in substantial increases in [her] wages, benefits, and other compensation."

 After reviewing the decisions of other district courts which have considered the issue, the Court finds that, in the instant case, Harris's failure to promote claims do not challenge a "compensation decision" as contemplated by the FPA.[20] As one sister court observed after the

---

**20.** In an email to the Court that is not part of the record, Harris supplemented her briefing, without seeking leave of the Court, by drawing the Court's attention to three different cases applying the FPA. In *Mikula v. Allegheny County of Pennsylvania*, 583 F.3d 181, 184–87 (3rd Cir.2009), the plaintiff alleged a discriminatory compensation claim, alleging that male employees who held similar positions were paid more. The Third Circuit's opinion does not indicate that the plaintiff advanced a failure to promote claim. The same is true of *Lohn v. Morgan Stanley*, in which the district court applied the FPA to

passage of the FPA, "[t]he rule set out in *Ledbetter* and prior cases—that 'current effects alone cannot breathe new life into prior uncharged discrimination'—is still binding law for Title VII disparate treatment cases involving discrete acts other than pay." *Leach v. Baylor College of Medicine*, Civil Action No. H–07–0921, 2009 WL 385450, at *17 (S.D.Tex. Feb. 17, 2009). In her dissent to the *Ledbetter* decision, which is admittedly not binding law, Justice Ginsburg elucidated the unique nature of compensation claims:

> Pay disparities often occur, as they did in Ledbetter's case, in small increments; cause to suspect that discrimination is at work develops only over time. Comparative pay information, moreover, is often hidden from the employee's view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials. Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves.
>
> Pay disparities are thus significantly different from adverse actions "such as termination, failure to promote, . . . or refusal to hire," all involving fully communicated discrete acts, "easy to identify" as discriminatory. See *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). It is only when the disparity becomes apparent and sizable, *e.g.*, through future raises calculated as a percentage of current

salaries, that an employee in Ledbetter's situation is likely to comprehend her plight and, therefore, to complain. Her initial readiness to give her employer the benefit of the doubt should not preclude her from later challenging the then current and continuing payment of a wage depressed on account of her sex.

*Ledbetter*, 550 U.S. at 645, 127 S.Ct. 2162 (Ginsburg, J., dissenting). Justice Ginsburg further explained the two types of employment practices actionable under Title VII: "discrete acts that are 'easy to identify' as discriminatory and acts that recur and are cumulative in impact." *Id.* (citing *Morgan*, 536 U.S. at 110, 113–115, 122 S.Ct. 2061). Compensation claims, as opposed to promotion claims, fall into the latter category:

> The realities of the workplace reveal why the discrimination with respect to compensation that Ledbetter suffered does not fit within the category of singular discrete acts "easy to identify." A worker knows immediately if she is denied a promotion or transfer, if she is fired or refused employment. And promotions, transfers, hirings, and firings are generally public events, known to co-workers. When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext. Compensation disparities, in contrast, are often hidden from sight.

*Id.* at 649, 127 S.Ct. 2162.[21]

As Justice Ginsburg's dissent makes clear, compensation claims, like hostile

---

the plaintiff's claim that the defendant used a discriminatory method for distributing client accounts. 652 F.Supp.2d 812, 828–29 (S.D.Tex.2009). Finally, in *Gilmore v. Macy's*, the district court granted summary judgment on the plaintiff's failure to promote claim before the FPA became law; after its passage, the district court only considered its effect on the plaintiff's remaining claims. No. 06–

3020, 2009 WL 305045, at *2–3 (D.N.J. Feb. 4, 2009).

**21.** *Rehman v. State University of New York at Stony Brook*, cited by Harris in her Response, recognized the distinction between the plaintiff's claims based on "discrete acts" and wage discrimination and held that, under the FPA, only the latter were timely. 596 F.Supp.2d at 651.

work environment claims, are fundamentally different from claims based on "discrete facts" because the discrimination accumulates over an extended period of time. Plaintiffs are often initially unaware that they are being paid an unequal wage: the discrimination can take years to identify. The same cannot be said for failure to promote claims. While it is clear that Congress meant to rectify *Ledbetter's* holding with regard to compensation claims, the statute's wording does not indicate that it meant to extend the statute of limitations for claims based on the "discrete acts" identified in *Morgan.* Congress did not specifically include these actions in the statute by listing particular employment actions or using the more global terms "adverse employment decision" or "discrete acts." Instead, it found that "[t]he limitation imposed by the Court [in *Ledbetter* ] on the filing of discriminatory compensation claims ignores the reality of *wage discrimination* and is at odds with the robust application of the civil rights laws that Congress intended." Pub. L. No. 111–2 sect. 2(2) (emphasis added).

The *Gentry* court's expansive interpretation of the FPA does not take into account the distinction between discrete acts and continuing violations. It could be argued that any of the discrete acts could somehow impact the plaintiff's wages and therefore be deemed a "compensation" decision: plaintiffs who are never hired, or who are terminated, likely suffer somewhat diminished compensation. It is more likely that the term "other practices" was intended to encompass the type of actions identified by Ledbetter, who was paid a consistently lower wage than her male counterparts in part because of biased performance reviews, and those described in paragraph 13

of Harris's Second Amended Complaint. Defendant's alleged practice of assigning male employees higher base salaries and lower quotas, as well as awarding male MSCs higher bonuses, are discriminatory acts that would not have been readily identifiable at the time they occurred. In contrast, the record indicates that Harris learned about the promotions of male and younger female MSCs sometime shortly after they occurred, even if Harris was not aware that the position were available before the promotion occurred. These promotions were therefore discrete acts that Harris knew about and could have identified as discriminatory within the 300 day filing period. The Court finds that the 300 day statute of limitations applies to Harris's failure to promote claims.[22]

### b) Promotions of Jim Hinchberger

 Defendant concedes that Harris's claims are timely with respect to two promotions Jim Hinchberger received—the first to National Sales Trainer on November 21, 2006, and the second to RSD on October 1, 2007. To prove a failure to promote claim under Title VII, Harris must establish that (1) she was a member of a protected class; (2) she sought and was qualified for a position; (3) she was not promoted to the position sought; and (4) an employee who was not a member of the protected class received the promotion. *Davis v. Dallas Area Rapid Transit,* 383 F.3d 309, 317 (5th Cir.2004).

Even assuming that Harris could demonstrate a prima facie case, her failure to promote claim must fail because Defendant has offered a non-discriminatory reason for Hinchberger's promotion. Defendant offered evidence that Hinchberger had been working with Defendant since it

---

**22.** The Court notes that, pursuant to this reasoning, all but one of Parks's failure to promote claims would be time-barred as well. Parks similarly failed, in Plaintiffs' Response,

to dispute Defendant's non-discriminatory explanation for promoting Hinchberger to the position of National Sales Trainer.

launched Auxilium in 2002, that he was consistently a "Top 10" volume producer, and he earned the President's Club status in 2005. In her Response, Harris argues that she has raised a fact issue concerning whether she was "clearly better qualified" than younger female employees who were promoted. She does not argue, however, that Defendant's proffered explanation for Hinchberger's promotions are false or that she was "clearly better qualified" than Hinchberger. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.,* 482 F.3d 408, 412 n. 11 (5th Cir.2007). As Harris has failed to produce any evidence of pretext, the Court will grant summary judgment on her failure to promote claim.

### 3. Retaliation Claim

Harris argues that Defendant retaliated against her after she repeatedly opposed Defendant's gender and age discrimination.[23] To survive summary judgment, Harris "must make a prima facie showing: (1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action." *Banks v. East Baton Rouge Parish Sch. Bd.,* 320 F.3d 570, 575 (5th Cir.2003) (internal quotation marks omitted).

According to Harris, she engaged in protected activity on two occasions. The first occurred on June 20, 2005, when Harris told Hatten that she believed he treated the male and female employees on his team differently ("First Complaint"). (Hatten Dep. 121:5–8.) Hatten communicated Harris's complaint to his immediate supervisor, Ed Kessig and Bruce Leim-

beck, the ASD, and said that she was "trying to yank his chain" and asked "Do I have to put up with this?" (Hatten Dep. 121:15–18; Kessig Dep. 123:9–16.) In response, Kessig and Leimbeck did not take any action with regards to Harris's accusation that Hatten was treating the male and female employees differently. (Kessig Dep. 122:14–18.) In his email response to Hatten's report about Harris's complaint of gender discrimination, Leimbeck said:

> As we discussed she is trying to pull your chain along with her own attempts to run the team the way she wants it run. I think you responded professionally and asserted your leadership as you need to. Move forward with your plan. . . . If she does not want to get on board she has the option to leave Auxilium as we discussed.

(Doc. No. 84, Ex. S.) Kessig likewise agreed that if Harris did "not want to get on board" she could quit. (Kessig Dep. 123:24–124:3.)

Nine days later, Kessig told Hatten that he "would not shed a tear if [Harris]" left the company. (Kessig Dep. 155–156.) Hatten responded that, "despite multiple claims to quit, it is my opinion that she has no desire to leave Auxilium. I am prepared to dig in with her. My discussion with Bruce last night was that I would wait until her numbers start to trail off before making this an issue. . . ." (Hatten Dep. 199–200.) Hatten, in his deposition, explained that Harris had been assigned the Beaumont and Lake Charles areas as part of her territory, but that she believed she could make more money for the company by spending as little time as possible

---

**23.** According to the record, after her first ride-along with Hatten, Harris called Sue Sharr in Defendant's Human Resources Department to complain about Hatten's homophobic and sexist comments. This complaint appears to have gone unheeded; however, Harris does not argue that it is a basis for her retaliation claim. (Harris Dep. 83–85.) Harris called Sharr again and asked if there had been any action with regard to her complaint, and Sharr informed her that another MSC had lodged a similar complaint. (*Id.* at 86:1–11.)

in those areas. Hatten was prepared to "see how it went" without Harris making repeated visits to that area, but that once the numbers started to trail off, he would have to insist that she go to those areas to try to grow the business. (Hatten Dep. 201.) Kessig attempted to explain his own comment, observing that Harris had taken a promotion as an HIV specialist and then a few weeks later told Kessig that she did not want the position because it required too much travel. (Kessig Dep. 153:13–25.) According to Kessig, Harris's decision not to take the position required the company's management to refigure the geography of the position, which affected not only Harris but also other individuals in Houston. (*Id.* at 154:1–9.) Kessig stated that one reason Harris was not later considered for a promotion was because she would not travel. (*Id.*)

The second instance of protected activity occurred two years later, in early 2007, when Harris lodged a second complaint, in writing, about Defendant's age and gender discrimination with Defendant's legal-counsel, Jennifer Evans–Stacy ("Second Complaint"). Defendant had just adopted its incentive compensation plan for MSC's that was based whether the MSC could fill a certain quota of Testim prescriptions written in her territory. (Doc. No. 84, Ex. F ¶ 9.) As discussed earlier, Harris had the highest quota in her region. In the first two quarters of 2007, Harris was unable to reach her quota and therefore failed to earn any significant incentive compensation. (*Id.* at ¶¶ 11–12.) In her letter, Harris claimed that the company had "set her up to fail" by assigning her a quota that was not only higher than that of male MSCs but that was completely unattainable. (Roberts Dep. 47–48.) Following this letter, Defendant did conduct an investigation. (*Id.* at 48:23–49:2.) Kessig did not see a copy of the letter Harris sent until after this lawsuit was filed. (Kessig Dep. 125:2–4.) In response to this Second Com-

plaint, Defendant's in-house legal counsel, Gabe Holdman, called Harris and, over the course of two days, allegedly berated her for failing to "get on board" and for continuing to protest the company's illegal discrimination. (Doc. No. 84, Ex. F ¶ 13.) Harris claims that Defendant's discriminatory practices ultimately caused her to suffer from depression and take medical leave beginning in June 2007. She resigned from Defendant's employ in October 2007. (Harris Dep. 83–84; 289–292.)

As a result of her opposition, Harris alleges four retaliatory acts: Defendant's refusal to rectify her unequal pay, refusal to promote her to an RSD position, "setting her up to fail" by making her 2007 annual quota unattainable, and constructively discharging her. Harris argues that all of these actions constitute "adverse employment actions." The Court will now consider each of these alleged retaliatory acts in turn.

Harris alleges first that Defendant retaliated against her by failing to rectify her unequal pay. Harris does not explain when she first complained to Defendant about her unequal pay, however, besides her Second Complaint regarding the quotas. Naturally, the Second Complaint occurred after her First Complaint, so there cannot be a causal link between Harris's First Complaint and Defendant's failure to rectify her pay.

▇▇ Next, Harris argues that Defendant retaliated against her by assigning her an unreasonably large quota. The quotas were assigned, however, some two years after Harris's First Complaint to Hatten in 2005. There is not sufficient temporal proximity between Harris's First Complaint and the imposition of the quotas to support an inference of retaliation. *Clark County School District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Hemsworth v. Quotes-*

*mith.Com*, 476 F.3d 487, 491 (7th Cir. 2007). Furthermore, at the time of Harris's Second Complaint, in 2007, the quota system had already been planned and implemented. "Employers need not suspend previously planned [employment decisions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Breeden*, 532 U.S. at 272, 121 S.Ct. 1508. Harris's failure to promote claims, which are time-barred, cannot serve as a basis for her retaliation claim. *See Smith v. Township of East Greenwich*, 344 Fed.Appx. 740, 747–48, 2009 WL 2873195, at *7 (3rd Cir. Sept. 8, 2009).

■■■ Finally, Harris argues that Defendant retaliated by discharging her. To prove that she was discharged in violation of Title VII or the ADEA, Plaintiff must establish that (1) she was discharged; (2) she was qualified for the position; (3) she was within the protected class at the time of the discharge; and (4) she was replaced by someone outside the protected class or otherwise discharged because of her gender or age. *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir.1993). Harris admits that she resigned from her position with Defendant, but she argues that she was constructively discharged. (Harris Dep. 79–80; Second Am. Compl. ¶ 24.) Such discharge has been deemed actionable under Title VII as a "tangible employment action." *See Donaldson v. CDB, Inc.*, 335 Fed.Appx. 494, 496–97 (5th Cir. 2009) (not designated for publication) (citing *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 410 n. 15 (5th Cir.2002)).

■■■ To establish constructive discharge, a plaintiff must show the "working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Id.* (citing *Lauderdale v. Tex. Dep't of Crim. Justice, Institutional Div.*, 512 F.3d 157, 167 (5th Cir.2007)). Al-

though a plaintiff is not required to demonstrate an employer intended to force her resignation, proving constructive discharge requires a greater degree of harassment than a hostile-work-environment claim. *Id.* Factors a court considers in concluding whether an employee was constructively discharged include:

(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

*Id.* Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge, as is a discriminatory failure to promote. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5 Cir.2001). Harris argues that she was constructively discharged because Defendant failed to compensate her equal to male MSCs, failed to promote her in favor of less qualified younger female MSCs, established an unattainable quota for her in 2007, failed to address "constant badgering and harassment," including Flatten's "unpunished reference to her as a 'high dollar whore.'" (Pls. Resp. at 67 n. 30.) As to Harris's argument regarding Defendant's failure to compensate her at the same rate as male MSCs and the establishment of unfair sales quotas, the Fifth Circuit has held that unequal pay, standing alone, cannot constitute constructive discharge. *Fitz v. Pugmire Lincoln–Mercury, Inc.*, 348 F.3d 974, 978 (11th Cir.2003) (citing *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1077 (5th Cir.1981)); *Cf. Stephens v. C.I.T. Group/Equipment Financing*, 955 F.2d 1023, 1027 (5th Cir. 1992) (upholding a jury's finding that the

plaintiff suffered a constructive discharge when he was demoted, asked to train his younger successor, forced to explain his demotion and introduce his successor to clients, assigned significantly reduced responsibilities, and received a $10,000 pay reduction after he was told his salary would not change). The Fifth Circuit has further held that an employer's "discriminatory failure to promote" a plaintiff, without aggravating factors, is insufficient to establish constructive discharge. *Brown v. Kinney Shoe Corp.*, 237 F.3d at 566 (holding that the plaintiff, who resigned, was not constructively discharged because he was "repeatedly denied promotions and transfer opportunities"; his work was not degrading or menial, and he was not subjected to badgering or harassment designed to encourage his resignation).

■ Finally, the evidence does not support Harris's claim that Defendant failed to punish Hatten's reference to her as a high dollar whore. Harris has presented no evidence that Hatten actually called her that term himself, or that these comments were so severe and pervasive that a reasonable person would resign. Furthermore, Harris admitted in her deposition that when she complained to Hatten about other employees using the term, he told her that he would "take care of it" and he later reported to her that he had spoken with four other employees about using the term. Harris did not lodge any further complaints with Defendant's Human Resources Department about the comments.

*See Moore v. United Parcel Service, Inc.*, 150 Fed.Appx. 315, 319 (5th Cir.2005) (not designated for publication). While Harris argues that Holdman called and berated her for two days after her Second Complaint, she failed to remember, in her deposition, what Holdman actually said to her during these conversations. (Harris Dep. 257–258.) Harris has therefore failed to establish a prima facie claim of retaliation.[24]

## III. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiffs' FLSA claims and Harris's Title VII and ADEA claims and **DENIED** as to Plaintiffs' EPA claims. Defendant's Motion to Strike Plaintiff's Summary Judgment Evidence and for Sanctions is **GRANTED** as to the motion to strike and **DENIED** as to the motion for sanctions. Defendant's Motion to Exceed Reply Page Limit is **GRANTED**. Plaintiffs' Motion for Conditional Class Certification is **DENIED AS MOOT** and Defendant's Motion to Extend Time to Respond to Plaintiffs' Motion to Certify Class is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

---

**24.** If the Court were to consider the merits of Parks's Title VII retaliation claim, it would likely find that she failed to present a prima facie claim. First, Parks fails to argue, or to offer any evidence, that Hatten or David Frick knew about the affidavit she submitted to Defendant's general counsel at the time she was subjected to a joint "ride along" or when she was terminated. Second, Park's only evidence to establish that her protected activity caused her termination is the temporal proximity between the events, four months, and

Defendant's hostile treatment of Harris, who Parks defended in her affidavit. As the Court has already discussed, Parks has not demonstrated that those involved in her termination decision knew she had submitted an affidavit supporting Harris. Furthermore, to be persuasive evidence, temporal proximity must be "very close." *Weiss Strong v. University Healthcare System*, 482 F.3d 802, 807–808 (5th Cir.2007) (citing *Breeden*, 532 U.S. at 273, 121 S.Ct. 1508). A four month lapse in time, without more, is insufficient. *Id.*